**INTERSTATE INVESTORS, INC.,**
Plaintiff,

v.

**UNITED STATES** of America and
Interstate Commerce Commission,
Defendants,

and

Transcontinental Bus System, Inc.,
Intervenor-Defendant.

No. 66 Civ. 3004.

United States District Court
S. D. New York.

July 22, 1968.

Royall, Koegel, Rogers & Wells, New York City, for plaintiff, Frederick W. P. Lorenzen, Russel H. Beatie, Jr., John S. Hibschman, William R. Burt, and Paul O. Bleecker, New York City, of counsel.

Robert M. Morgenthau, U. S. Atty., David Paget, Asst. U. S. Atty., Robert W. Ginnane, Gen. Counsel, ICC, and Jerome Nelson, Washington, D. C., of counsel, for defendants.

Lord, Day & Lord, New York City, for intervenor-defendant John W. Castles, III, New York City, Warren A. Goff, Dallas, Tex., Vincent M. McConnell, and Dan L. Goldwasser, New York City, of counsel.

OPINION

Before FEINBERG, Circuit Judge, and MURPHY and BRYAN, District Judges.

FREDERICK van PELT BRYAN, District Judge:

This is an action under 28 U.S.C. §§ 2321–25 to set aside and enjoin the enforcement of an order of the Interstate Commerce Commission.

The order dated August 10, 1966, approved the acquisition by the intervenor defendant Transcontinental Bus Lines, Inc. (Transcon), a major intercity bus carrier, of three other bus carriers in the southeastern United States, Virginia Stage Lines, Inc. (Virginia), Safeway Trails, Inc. (Safeway) and Queen City Bus Lines, Inc. (Queen). The acquisition was to be effected through an exchange of stock between Transcon and the three acquired carriers. Each of the acquired carriers in turn controlled several subsidiary bus carriers.

The intercity nationwide bus industry is dominated by the Greyhound System. Transcon, though only one-fifth the size of Greyhound prior to the acquisitions under review, is its major competitor. Transcon also is a member of National Trailways Bus System (N.T.S.), a non-profit association whose membership consists of a large number of intercity bus carriers, including the three acquired companies. To foster competition with Greyhound's nationwide operations, the N. T. S. members have adopted Trailways as a common trade name, use uniform paint schemes and markings on their busses, have joint terminals, some through bus arrangements and coordinate advertising, purchasing and other essential functions.

The applications of Transcon to the I. C. C. for approval of the acquisition of Virginia, Safeway and Queen, pursuant to Section 5 of the Interstate Commerce Act, 49 U.S.C. § 5, were made to improve its competitive position in the southeastern United States where it had almost no operations. All three applications were opposed by Greyhound which did not join in this action, and as to the Queen acquisition by Interstate Investors, Inc. (Interstate), the plaintiff here.

Interstate is a Delaware corporation with its principal office in New York. The nature of its business is not clear but it is not a bus operator. Immediately prior to the time when Transcon reached agreement with Queen, Interstate claims to have made an oral agreement to purchase Queen as a first step toward the formation of a so-called third force of bus carriers in the southeast to compete with Transcon and Greyhound. Interstate further claims that Transcon caused Queen stockholders to breach their oral understanding with Interstate and enter into the exchange of stock acquisition agreement with Transcon instead.

During the pendency of the acquisition proceedings Interstate also filed a complaint with the I. C. C. pursuant to § 11 of the Clayton Act, 15 U.S.C. § 21, alleging that Transcon's conduct prior to the I. C. C.'s approval of the acquisition amounted to an unlawful acquisition of control of Queen and constituted consummated anti-trust violations contrary to § 7 of the Clayton Act.[1] The I. C. C. dismissed this proceeding on the ground that it pertained to issues of fact and record in the acquisition proceedings.[2]

After extensive hearings on the acquisition applications the I. C. C. approved acquisition of Virginia, Safeway and Queen by Transcon and issued the order to that effect here under review. See Transcontinental Bus System, Inc.— Control—Virginia Stage Lines, 101 M. C.C. 529 (1966). In MC–F–8744, embraced in the order under review, Transcon acquired control of Virginia and Safeway, Inc.[3] In MC–F–8774 the I.

1. MC–C–4969. The petition was filed December 10, 1965. A supplemental complaint was filed February 11, 1966.

2. Division 3 of the I.C.C. dismissed the proceeding May 27, 1966 and denied

plaintiff's petition for reconsideration on August 8, 1966.

3. Through the acquisition of Virginia and Safeway, Transcon also acquired control of Trailways of New England (TNE);

C. C. approved Transcon's acquisition of control of Queen.[4] Authority was granted to Transcon to issue additional shares of its common stock to exchange for the stock of the acquired companies.[5] The order also dismissed Interstate's petition for reconsideration of its complaint filed pursuant to § 11 of the Clayton Act which had been previously dismissed.[6]

Interstate then commenced this action to annul and set aside the order. The prolix and confused amended complaint alleges in substance that the order of the I. C. C. was contrary to law, was unsupported by substantial evidence and was procured by fraud upon the Commission upon the part of Transcon. In addition, it contains a private anti-trust claim for relief against Transcon under the Sherman and Clayton Acts and a private claim for deceit.

The present posture of the action is complex. Interstate brought on its application for the appointment of a three-judge court under 28 U.S.C. §§ 2321-25, 2284, by an order to show cause which contained an ex parte temporary restraining order against the enforcement of the I. C. C. order under attack. At the initial hearing before the district judge sitting in motion part the application for the appointment of this three-judge court was granted and Transcon was given leave to intervene as a defendant. However, the temporary restraining order was vacated. Interstate's motion for preliminary injunctive relief was reserved for the three-judge court. Both the I. C. C. and Transcon have answered the amended complaint.

During the course of the proceedings a number of motions have been made by the parties which include the following:

1. A motion by Interstate for preliminary injunctive relief which was reserved to the three-judge court at the initial hearing.

2. Motions by the I. C. C. and Transcon to dismiss the action on the ground that Interstate lacks standing to attack the order of the I. C. C. under review.

3. A motion by Interstate to set aside the vacation of the initial temporary restraining order and for other equitable relief on the ground that the decision was brought about by fraud upon the court on the part of Transcon.

4. Several motions by Interstate for discovery against both Transcon and the I. C. C. on a wide variety of subjects.

5. A motion by Transcon to dismiss the private anti-trust and deceit claims alleged by Interstate.

The merits of the action and all pending motions were argued before this three-judge court at the same time and will be considered and decided together.

I.

We will deal first with Interstate's claim that the order of the I. C. C. under attack here was obtained by fraud upon the I. C. C. on the part of Transcon and that Transcon has continued such fraudulent conduct in this court. Compare Hazel-Atlas Glass Co. v. Hartford-Empire Co., 322 U.S. 238, 64 S.Ct. 997, 88 L.Ed. 1250 (1944); Chas. Pfizer & Co. v. Davis-Edwards Pharmacal Corp., 385 F.2d 533 (2d Cir. 1967); Root Refining Co. v. Universal Oil Products, Co., 169 F.2d 514 (3d Cir. 1948), cert. denied, Universal Oil Products Co. v. William Whitman Co., Inc., 335 U.S.

Tennessee Trailways (Tenn.T); Service Coach Lines; Carolina Scenic Stages; Coastal Stages Corporation; and The Gray Line of Charleston.

4. Through the Queen transaction, Transcon also acquired control of Smokey Mountain Stages; Georgia-Florida Coaches and Fort Bragg Coach Company. Addi-

tionally, Transcon acquired Queen's interest in Tenn.T, Scenic, Coastal and Gray.

5. Finance Docket 23159 (Queen Purchase) and Finance Docket 23123 (Safeway and Virginia purchases).

6. See note 2 supra.

912, 69 S.Ct. 481, 93 L.Ed. 444 (1949); Chicago Title & Trust Co. v. Fox Theatres Corp., 182 F.Supp. 18 (S.D. N.Y.1960). In order to understand Interstate's claim of fraud, a brief review of the background of this case is necessary.

For several years Transcon, the largest member of N. T. S., has been seeking control of other N. T. S. members. At the time of the events in suit Transcon's routes were nationwide with the exception of through-routes running north and south along the Atlantic Coast. Several other N. T. S. members, including Virginia, Safeway and Queen, operated routes in this area. By agreements among these and other companies, N. T. S. was able to offer through service along the Atlantic Seaboard.

In the 1960's, Interstate and its President, Burt, became interested in welding the Trailways carriers running along the Atlantic Seaboard into a single unit. Having acquired financial backing, Burt on behalf of Interstate sought to purchase control of some of these companies. He directed his attention primarily to two, Queen and Tamiami.[7] By early 1964 talks between Interstate and the controlling stockholders of Queen had progressed toward agreement. By March 28, 1964, Burt and Interstate claim they had a deal to purchase all of Queen's stock for approximately $8,000,000.

Transcon had long been interested in acquiring Queen and had conducted negotiations on and off with several major Queen stockholders for some years. When it learned of the possible Queen-Interstate deal, either from Queen or by letter from Interstate, Transcon immediately started negotiating in earnest.

By letter dated April 28, 1964, the President of Queen proposed an arrangement to Transcon. The suggested purchase price was about $8,000,000, approximately the same as offered by Interstate, but involved an exchange of stock. The letter also stated four conditions, the last of which was a guarantee by Transcon to buy back from some of the Queen's stockholders who wanted to cash the Transcon stock at a fixed price of $31.50 per share. Interstate focuses on this fourth proposed condition of guaranteed repurchase.

On May 21, 1964, the Queen board approved a counter-offer by Transcon which did not mention any conditions of the April 28 letter. Prior to such approval, the Queen directors implemented all of the other conditions of the letter, but no mention was made of any arrangement to provide Queen's stockholders with cash for their Transcon stock.

The purchase agreement provided for the exchange of 7.25 shares of Transcon common stock for each share of Queen stock.[8]

Queen stockholders were to assent to the transaction by delivering their Queen shares to a named bank as depository. The depository bank would then issue a receipt corresponding to the number of shares delivered. The stock deposited would be held by the bank pending determination of Transcon's application to the I. C. C. for approval of control. If approval were granted, the deposited stock would be transferred to Transcon and Transcon would issue shares of its common stock in return for the deposit receipts. During the period of deposit, the holders of the receipts had the voting and dividend rights to the Queen stock. Prior to consummation, Queen was not to perform any act or enter into any transactions outside its ordinary course of business and Transcon

---

7. Tamiami Trail Tours, Inc. is a member of N.T.S. principally operating in Georgia and Florida. It is not involved in the acquisitions under review.

8. The agreement also involved the exchange of 7.25 shares of Transcon for each share of General Realty and Insurance Corp. (GRIC) a non-carrier owned by some of Queen's stockholders and in turn owning stock in Queen.

was to take no action which would dilute the value of its common stock. The entire agreement, as well as Transcon's application to the I. C. C. for approval of control,[9] was conditioned on a favorable ruling from the Internal Revenue Service that the exchange of stock was tax-free.

Before the I. C. C. examiner opened hearings in the fall of 1964, two significant events occurred. Interstate filed suit against Queen and the Queen stockholders in the United States District Court for the Western District of North Carolina for breach of contract, seeking money damages and not specific performance. Transcon was not a party to the action. During the same period, several Queen shareholders sold their deposit receipts for cash.[10] It is not presently disputed that the receipts ultimately came into the hands of a Transcon subsidiary.[11] Interstate alleges that these purchases were made pursuant to a secret agreement by Transcon to purchase the receipts of these Queen's stockholders who wanted cash.

When the hearings opened in Washington on September 9, 1964, Interstate questioned the Transcon witnesses in an effort to establish that such a secret agreement existed. Moore, the President of Transcon, testified in response to questions from Greyhound's counsel that Transcon did not make a market for the deposit receipts.[12]

Similar questions were asked by Interstate of Scheitel, the Vice-President of Transcon, who negotiated the contracts with Queen, Virginia and Safeway. He testified that while he had learned some of the deposit receipts had been sold, he did not know who had bought them.[13] He emphasized that Transcon

9. Transcon's application for control of Virginia and Safeway was filed with the I.C.C. May 2, 1964; its application for control of Queen was filed June 5, 1964. The proceedings were consolidated by the Commission.

10. The record shows that 10 Queen stockholders sold deposit receipts for 1387 shares of Queen stock prior to the opening of hearings. The sales occurred on six different dates. The sums paid ranged from $250 per share to $290 per share. After the hearings closed 617 additional shares were sold at prices ranging from $241.25 per share to $260 per share. The total of 2004 shares represents less than 10% of the 22,264 shares of Queen outstanding. As will appear later, all of these shares were purchased by Highway Insurance of Switzerland, a corporation the I.C.C. found presumptively controlled by Transcon. See 101 M.C.C. at 540 n. 7.

11. According to Footnote 16 of the I.C.C. brief the purchases were all made by Messrs. Goff, General Counsel of Transcon, Scheitel, Chief Financial Officer of Transcon, Hamilton and Robinson, two other employees of Transcon.

12. The pertinent questions and answers are as follows:
"Question: Have you, or any officer, to your knowledge, of Transcontinental, Continental or its subsidiaries, agreed, by contract or by oral agreement, to supply the funds necessary to purchase the depository receipts or to make a market in these depository receipts?
"Answer: They have not." [Hearings p. 971].
"Question: And a final question: What you are saying here in this hearing is that you know nothing about the market that was made in these depository receipts?"
"Answer: I don't know that there is a market as such."
"Question: But you did seek * * *
"Answer: I understood from the testimony yesterday that there had been some trading. I mean, is this one, or is this ten trades, or one trade, or a hundred trades? How many, I have no knowledge of."
"Question: And are you also saying whether there was one or ten, you knew not how the trade or how the market was set up?"
"Answer: No, Transcontinental has no commitments. I mean, we have no part of it." [Hearings p. 973].

13. In view of the disclosure in the I.C.C. brief, see note 11 supra, that Scheitel was one of the four Transcon officials who purchased the deposit receipts, this testimony is plainly incredible if it referred to the deposit receipts.

had made no commitment to provide a market for the deposit receipts.[14]

Plaintiff argues that this chain of testimony establishes that Transcon had a side agreement to purchase deposit receipts from those Queen shareholders who wanted cash. Interstate points out that prior to Commission approval deposit receipts representing 2004 Queen shares, or approximately 10% of Queen stock outstanding, were sold through various brokers.[15] It now appears that these receipts were purchased in the first instance by four Transcon officers, including Scheitel,[16] evidently for the account of Highway Insurance Company of Zurich, Switzerland, a company controlled by Transcon.[17] From this, plaintiff concludes that Moore and Scheitel testified falsely concerning their knowledge as to the identity of the purchaser of the deposit receipts.

Interstate would also carry the chain of inference one step further. The letter of April 28, 1964, from Queen to Transcon offering to sell at $8 per share contained a condition guaranteeing the repurchase of Transcon shares at an agreed price. The testimony is clear that the April 28 offer was rejected by Transcon, and that the final purchase agreement did not include such a condition.

Interstate argues, however, that the evidence shows that Transcon did agree informally to make a market for the receipts and that its officers deliberately falsified their testimony to conceal the

---

14. The relevant part of Scheitel's testimony is as follows:

"Question: Has Transcontinental at any time advised people where, the shareholders where they would find a market for the depository receipts?

"Answer: Yes, sir. The depository receipts were issued on the basis that they were marketable, and if they could find a market fine.

"Question: Did Transcontinental advise them where they could find such a market?

"Answer: We told them they should go to their brokers.

"Question: Did you suggest the name of a broker?

"Answer: We suggested the possibility of Goodbody and Company that made a market in Transcontinental stock, might be interested, yes, sir.

"Question: Have you made any back-up arrangement with Goodbody and Company?

"Answer: No, sir.

"Question: Is there privity between Goodbody and Company and stockholders or directors of Transcontinental?

"Answer: No, sir.

"Question: And, to your knowledge, have the trust receipts been marketed?

"Answer: I understand, I think somebody sold, yes.

"Question: Was it a part of your prior negotiations on the consideration that there would be such a market?

"Answer: No, sir. [Hearings pp. 200–01].

"Question: Well, if * * * you will concede that if this transaction is not approved by the Commission, what Goodbody and Company is making a market in is not Transcontinental stock, but in Queen City stock, for which there is no market?

"Answer: I don't know that they are making a market in Queen City stock.

"Question: But you know that some has been sold?

"Answer: I don't know who bought it.

"Question: Pardon me?

"Answer: Queen City—repeat your question, please.

"Question: You know that some has been sold?

"Answer: I was told some was sold.

"Question: You say there was no part of your prior discussions with the selling—holding shareholders that there would be a market for their trust receipts provided by Goodbody and Company?

"Answer: No, sir." [Hearings pp. 202–03].

15. See note 10 supra.

16. See note 11 supra.

17. Highway Insurance is a Swiss corporation authorized to write all types of insurance outside of Switzerland. Highway is evidently a wholly-owned subsidiary of Western Sales, Inc. Transcon owns 49% of Western's stock, having distributed the remaining 51% to its shareholders in September 1964. The I.C.C. found that Transcon controlled both Western and Highway. 101 M.C.C. at 540 n. 7.

)

existence of such an agreement. It points to a letter from Moore to Hardison, a major Queen stockholder, accompanying the final agreement to the effect that the deposit receipts could be issued to represent any number of Queen shares, and that they were assignable and prime loan collateral. Additionally, Transcon, through Scheitel, suggested that Goodbody and Company might be able to make a market for the receipts, despite the poor market potential for Queen shares.[18] Finally, Transcon did in fact purchase some deposit receipts, albeit indirectly.

■ Plainly the fact that false or misleading testimony was given during the course of a judicial proceeding does not constitute a fraud upon the court unless it appears that the court was so misled by such testimony as to render a decision based on a mistaken view of the material facts. See Hazel-Atlas Glass Co. v. Hartford-Empire Co., 322 U.S. 238, 246–247, 250, 64 S.Ct. 997, 88 L.Ed. 1250 (1944); American Cyanamid Co. v. F. T. C., 363 F.2d 757, 772–779 (6th Cir. 1966), on remand, 3 CCH Trade Reg.Rep. ¶ 18,077 (Sept. 29, 1967). This is of course equally true in an administrative proceeding.

■ There has been no showing here that the I. C. C. was in any material way mislead by the testimony relied upon by Interstate or that it based any part of its decision on a mistaken view of the facts.

Let it be assumed for purpose of argument that Transcon concealed the fact that it purchased deposit receipts for Queen stock prior to Commission approval. Interstate urges that if this be so disclosure of the facts would have led the Commission to a different conclusion because then it would have found unlawful acquisition of control or consummation of the transaction prior to Commission approval in violation of § 5(4) of the Interstate Commerce Act, 49 U.S.C. § 5(4).

■ Plaintiff's reliance upon § 5(4) is misplaced. The record shows that Transcon acquired deposit receipts representing approximately 10% of the stock of Queen and 2% of the stock of Virginia. 101 M.C.C. at 539–40. In addition, Transcon had purchased 21% of the stock of Safeway in October 1963. 101 M.C.C. at 540. Having found these facts,[19] the Commission concluded that Transcon had not acquired unlawful control of Virginia, Safeway or Queen within the meaning of § 5(4). 101 M.C.C. 543. In reaching its conclusion the Commission applied the proper test that under § 5(4) control means the power to exercise control or management of the controlled company's operations. See e. g., Gilbertville Trucking Co. v. United States, 371 U.S. 115, 83 S.Ct. 217, 9 L.Ed.2d 177 (1962); Missouri-Pacific R. Co.—Control—Chicago & E. I. R. Co., 327 I.C.C. 279 (1965), aff'd sub nom. Illinois Central R. Co. v. United States, 263 F.Supp. 421 (N.D. Ill.1966), aff'd per curiam, 385 U.S. 457, 87 S.Ct. 612, 17 L.Ed.2d 509 (1967).[20] There was no such control here and the Commission's conclusion is amply supported by the record.

Interstate complains that the Commission made no finding with respect to plaintiff's theory that Transcon had

18. Queen's shares were closely held by a few families. No shares had been sold outside of the family groups prior to the issuance of the deposit receipts.

19. Interstate also argues that Transcon's concealment of these facts misled the plaintiff into settling its suit against Queen and the Queen stockholders. If this be so plaintiff's remedy lies in the District Court for the Western District of North Carolina which approved the settlement and dismissed the action, and not here.

20. Plaintiff argues that Transcon's pre-approval purchases of deposit receipts constitute an anti-trust violation within the meaning of Carnation Co. v. Pacific Westbound Conference, 383 U.S. 213, 932, 86 S.Ct. 781, 15 L.Ed.2d 709, 851 (1966). We need not decide this question in view of our disposition of plaintiff's private anti-trust claim. See Section II, infra.

agreed to make a market for the deposit receipts. This is not surprising, however, in view of its ruling, which we have affirmed, that on all the facts presented Transcon's actual ownership of some deposit receipts did not amount to an unlawful acquisition of control in violation of § 5(4).

In reaching its conclusion, the Commission correctly imputed to Transcon control of Western and Highway and ownership of the deposit receipts which had been sold. 101 M.C.C. at 540 n. 7. While the I. C. C. report does not contain an explicit finding that there was no secret agreement on the part of Transcon to purchase or make a market for the deposit receipts, the evidence in the record was quite sufficient to support such a finding. Transcon and Queen officials strenuously denied that there was any such commitment, and the Commission was entitled to credit their testimony. Of course, Transcon's purchase of some deposit receipts does not, by itself, establish the existence of such an agreement.

Moreover, it is significant to note that the I.C.C., upon whom plaintiff alleges fraud in this respect was committed, makes no such claim to us. Instead, it points out to us in its brief that the Commission found that the "purchase of the depository receipts [was not] a partial consummation of the transactions," 101 M.C.C. at 543, and urges that this necessarily included a finding that there was no agreement, formal or informal, to purchase the receipts.

In view of these findings and conclusions there is no merit to Interstate's contention that the testimony complained of resulted in an order tainted with fraud. There is no showing of reliance by the Commission upon false or misleading testimony, or any indication that the Commission was misled. Equitable intervention by this court is plainly not warranted. Cf. Chas Pfizer & Co. v. Davis-Edwards Pharmacal Corp., 385 F. 2d 533, 537 (2d Cir. 1967); Root Refin-

ing Co. v. Universal Oil Products Co., 169 F.2d 514 (3d Cir. 1948).

Finally, Interstate charges that fraud was committed on the Commission in that Transcon and Queen obtained a favorable tax ruling from the Internal Revenue Service under § 368(b) of the Internal Revenue Code on the exchange of stock by concealing or falsifying the facts with respect to the alleged agreement to purchase and the purchase of Queen's stock by Transcon for cash. Interstate argues that since the approval of the acquisition was conditioned upon such a favorable tax ruling its concealment was in effect a fraud upon the Commission.

Whether in fact such an alleged agreement and purchase would have barred the transaction from qualifying under § 368 (b) is in dispute and it is unnecessary to pass upon that question here. The only connection between the tax consequences of the exchange of stock transaction and the petition to review is that Transcon's application to the Commission and its contract of purchase were conditioned upon a favorable ruling. The letter ruling was obtained by Queen and Transcon on the basis of facts stated by them to the Revenue Service. Based upon these facts, the Revenue Service determined the tax consequences of the transaction. A favorable letter ruling was issued with respect to Queen on June 15, 1965, and made part of the I.C.C. record as a late-filed exhibit. The letter ruling states that "there is no commitment, formal or informal, by Transcontinental * * * to purchase stock from any of the shareholders of Queen or Realty after consummation of the proposed exchange, or to purchase depository receipts before that time."

█ The Commission knew plaintiff had made its claims to the Revenue Service, including assertion of the secret agreement theory; it is also a matter of record that its own Bureau of Enforcement had conducted an investigation.[21] Moreover, whatever might be the interest of the Revenue Service, which plaintiff

---

21. See Brief for the I.C.C. at p. 50 and n. 22.

has kept advised,[22] in the tax consequences of the acquisition and the factual justification therefor, it does not lead to nonenforcement of the Commission order. The conditioning of Transcon's application for control upon a favorable letter ruling does not affect our conclusion. If the ruling is withdrawn, then Transcon or Queen must apply to the I.C.C. for appropriate relief, if they so desire. It should be noted that the I.C.C. order under review is not conditioned upon the continued validity of the letter ruling.

Nor does Interstate's claim that Transcon concealed its 100% ownership of Western Sales during part of August and September, 1964, provide any basis for relief in this proceeding. The letter ruling states that Western was only a 49% subsidiary of Transcon in June, 1965, a statement apparently accurate at that time. Plaintiff argues, however, that Transcon's 100% ownership of Western during a period in 1964 when Highway, a wholly owned subsidiary of Western, purchased some of the Queen deposit receipts would, if disclosed to the Revenue Service, defeat the letter ruling. Regardless of the tax consequences which might flow from Transcon's 100% ownership of Western for a short period, no attempt was made to conceal that fact from the I.C.C.. Both the examiner and the Commission found as a fact that Transcon held 100% of Western's stock during part of 1964, until it distributed 51% of Western to its own shareholders. See Examiner's Report p. 29 n. 15; 101 M.C.C. at 540 n. 7. These findings are amply supported by the record.[23]

Upon this record it is plain that plaintiff has not established that the order under review was obtained by fraud. Plaintiff's motion for equitable relief based on fraud is denied.

Plaintiff has also requested that this court conduct a plenary investigation of the facts, and that it be allowed discovery with respect to the fraud allegations. ' Since we agree with the Commission and the United States that the Commission was not materially misled, these motions are also denied.

## II.

Plaintiff has joined in its action for review of the I.C.C. order approving Transcon's control application, a civil suit against Transcon. The amended complaint alleges claims for relief based on deceit and the anti-trust laws, Sherman Act §§ 1, 2, 15 U.S.C. §§ 1, 2; Clayton Act § 7, 15 U.S.C. § 18, and seeks divestiture, treble-damages, and an accounting. Both Transcon and the I.C.C. urge that this private action is not properly before the statutory three-judge court.

We are mindful that the three-judge procedure should be used sparingly in view of the heavy demands it makes upon judicial manpower, and the burden that direct appeal imposes on the Supreme Court. See United States v. Interstate Commerce Commission, 337 U.S. 426, 69 S.Ct. 1410, 93 L.Ed. 1451 (1949); Utica Mutual Ins. Co. v. Vincent, 375 F.2d 129, 130–131 (2d Cir. 1967). Consequently the rule has evolved that private claims should not be joined with a petition to review an I.C.C. order unless they are ancillary to or dependent upon the judgment of the court as to the Commission's order. Pittsburgh & W. Va. Ry. Co. v. United States, 281 U.S. 479, 50 S.Ct. 378, 74 L.Ed. 980 (1930); compare Luckenbach S. S. Co. v. United States, 179 F.Supp. 605, 614 (D.Del. 1959), modified on other grounds, 364 U.S. 280, 80 S.Ct. 1611, 4 L.Ed.2d 1719 (1960). Where the factual basis of the

22. See letter of William R. Burt to Reorganization Branch, Internal Revenue Service, dated October 30, 1964, included as Exhibit E to Complaint Exhibit F; Letter from William R. Burt to Sheldon S. Cohen, Commissioner of Internal Revenue, dated December 7, 1966, included as Exhibit 84 to plaintiff's supplemental appendix.

23. Both Moore, see Hearings pp. 69–70, 898, and Scheitel, see Hearings pp. 167, 231–32, testified as to Transcon's 100% ownership and the subsequent dividend.

private claims are related to the petition to review, the decision whether to permit joinder before the three-judge court is largely discretionary. See Atlantic Lumber Corp. v. Southern Pac. Co., 47 F. Supp. 511 (D.Ore.1942) (3 judges); id, 47 F.Supp. 514 (D.Ore.1942) (1 judge).[24]

Plaintiff's argument that joinder should be permitted in this case is based largely upon Luckenbach S. S. Co. v. United States, supra, which held that the anti-trust issues and the petition to review were "so inextricably enmeshed that it would be unwarranted to truncate the litigation at this juncture." 179 F.Supp. at 614. There, both claims involved the effect upon the petitioning coastal shipowners of a railroad joint rate which the Commission had refused to suspend. There is no such close connection between the two branches of Interstate's complaint. The primary issue presented by the petition to review is whether the Commission's finding that the acquisitions of control are in the public interest is supported by substantial evidence. Plaintiff's private action against Transcon centers about its alleged contract to purchase Queen, and the consequences flowing from Transcon's conduct prior to Commission approval of these acquisitions.[25]

■ In our view, the issues presented by the petition to review are so different from those raised by plaintiff's private action that joinder is unnecessary to an effective review of the I.C.C. order. See Pittsburgh & W. Va. Ry. Co., supra. Consequently, we dismiss those portions of plaintiff's complaint seeking private relief from Transcon without prejudice to the filing within sixty days of an amended complaint stating the private claims for relief only to be heard before a single district judge.

### III.

Plaintiff has moved for pre-trial discovery on the merits against both defendants. Its motions seek depositions and the production of documents by Transcon, and access to internal staff memoranda and opinions from the I.C.C. Both defendants oppose these motions on the ground that pre-trial discovery is not permitted in an action to review an I.C.C. order; in addition, the I.C.C. asserts a claim of privilege with respect to its internal memoranda and opinions. See T.S.C. Motor Freight Lines, Inc. v. United States, 186 F.Supp. 777 (S.D.Tex. 1960), aff'd sub nom. Herrin Transp. Co. v. United States, 366 U.S. 419, 81 S.Ct. 1356, 6 L.Ed.2d 387 (1960).

■ On review of an I.C.C. order, this court's task is limited to determining whether the Commission's conclusions are adequately supported by its

---

24. Plaintiff argues that once our jurisdiction is properly invoked by the petition to review, we have the power to decide, and must decide, all questions of law and fact presented, citing Railroad Commission of California v. Pacific Gas & Electric Co., 302 U.S. 388, 391, 58 S.Ct. 334, 82 L.Ed. 319 (1938), and Sterling v. Constantin, 287 U.S. 378, 393–394, 53 S.Ct. 190, 77 L.Ed. 375 (1932). These cases hold only that a statutory three-judge court may decide any question of state or federal law necessary to decision, and are simply a corollary to the rule that once our jurisdiction is properly invoked, we may decide the case on any ground, including grounds that would not justify our convocation. See United States v. Georgia Public Service Commission, 371 U.S. 285, 83 S.Ct. 397, 9 L.Ed.2d 317 (1963). When the issue presented is collateral to the petition for review, as where a merger approved by the I.C.C. is alleged to be violative of the corporate charter of one of the carriers, the collateral issue is not within the jurisdiction of a three-judge court. See Pittsburgh & W. Va. Ry. Co. v. United States, 281 U.S. 479, 50 S.Ct. 378, 74 L.Ed. 980 (1930); Cleveland, Cincinnati, Chicago & St. Louis Ry. Co. v. United States, 275 U.S. 404, 48 S.Ct. 189, 72 L.Ed. 338 (1928).

25. In view of our holding that the Commission's order is supported by substantial evidence, see Section IV infra, the acquisitions themselves are exempted from the anti-trust law, 49 U.S.C. § 5 (11). Thus plaintiff's anti-trust remedies, if any, are limited to the period prior to Commission approval. Carnation Co. v. Pacific Westbound Conference, 383 U.S. 213, 932, 86 S.Ct. 781, 15 L.Ed.2d 709, 851 (1966).

findings of fact, and whether the findings are supported by substantial evidence on the record as a whole. E. g., United States v. Carolina Freight Carriers Corp., 315 U.S. 475, 62 S.Ct. 722, 86 L.Ed. 971 (1942); Eastern Central Motor Carriers Ass'n v. United States, 239 F.Supp. 591 (D.D.C.1965). In making this determination, the court considers only the evidence contained in the record made before the Commission, and cannot accept evidence de novo. See Tagg Bros. & Moorhead v. United States, 280 U.S. 420, 50 S.Ct. 220, 74 L.Ed. 524 (1930); Frozen Food Express v. United States, 219 F.Supp. 131 (N.D. Texas 1963); cf. Mississippi Valley Barge Line Co. v. United States, 292 U.S. 282, 54 S.Ct. 692, 78 L.Ed. 1260 (1934). The only exceptions are cases falling within the jurisdictional facts doctrine, see Crowell v. Benson, 285 U.S. 22, 52 S.Ct. 285, 76 L.Ed. 598 (1932), or challenging a rate order as confiscatory, see American Trucking Ass'ns v. United States, 344 U.S. 298, 73 S.Ct. 307, 97 L.Ed. 337 (1953); St. Joseph Stock Yards Co. v. United States, 298 U.S. 38, 56 S.Ct. 720, 80 L.Ed. 1033 (1936). This case falls within neither of these exceptions and we are limited to consideration of evidence contained in the record made before the I.C.C.

 Rule 26 entitles a party to examine his opponent as to any matter not privileged which is reasonably calculated to lead to the discovery of admissible evidence. While Rule 26 should not be read narrowly, it plainly precludes depositions in those situations where no evidence could be admitted in any event. See Walled Lake Door Co. v. United States, 31 F.R.D. 258 (E.D.Mich.1962). Nor has plaintiff shown the requisite good cause to entitle it to discovery and inspection pursuant to Rule 34. Plaintiff's motions for discovery are denied.

## IV.

With these matters disposed of we turn to the merits.

Interstate claims that the order of the I.C.C. should be set aside because:

(a) The issuance of deposit receipts by Transcon without prior Commission approval violated § 20a(2) of the Interstate Commerce Act, 49 U.S.C. § 20a(2).

(b) The issuance of these receipts and Transcon's purchase of some of them gave Transcon prior control of Queen in violation of § 5(4) of the Interstate Commerce Act, 49 U.S.C. § 5(4).

(c) Transcon's conduct with respect to the issuance and purchase of deposit receipts violated § 7 of the Clayton Act, 15 U.S.C. § 18.

(d) The Commission ignored the anticompetitive effects of permitting a duopoly in the intercity bus industry.

### A. The Section 20a claim.

Section 20a(2), made applicable to motor carriers by 49 U.S.C. § 314, makes it unlawful for any carrier "to issue any share of capital stock or any bond or other evidence of interest in or indebtedness of the carrier * * * or to assume any obligation or liability * * * in respect of the securities of any other person" without obtaining prior approval from the I.C.C. Approval may be granted only if the Commission finds that the issue "(a) is for some lawful object within its corporate purposes, and compatible with the public interest, which is necessary or appropriate for or consistent with the proper performance by the carrier of service to the public as a common carrier, and which will not impair its ability to perform that service, and (b) is reasonably necessary and appropriate for such purpose."

Interstate argues that the deposit receipts issued by the respective depository banks to assenting stockholders of Queen and other acquired companies in return for their stock constitute securities within the meaning of § 20a, and their issuance without prior commission approval voids the acquisition transactions.

This argument was not raised before the Commission until August 24, 1966, two years after the receipts had been issued, and after the I.C.C. had rendered its decision. Prior to August 1966, Interstate had insisted that the deposit receipts were subject to the registration

requirements of the Securities Act of 1933. To maintain this position, plaintiff was forced to assert that the deposit receipts were not within the purview of Section 20a, in order to avoid the exemption of regulated carriers' securities from S.E.C. jurisdiction contained in 15 U.S.C. § 77c(6).

 It is well settled that the refusal of the Commission to reopen a case to consider an argument presented for the first time after decision was rendered will not be overturned unless its action was a clear abuse of discretion. United States v. Pierce Auto Freight Lines, 327 U.S. 515, 535, 66 S.Ct. 687, 90 L.Ed. 821 (1946); United States v. Northern Pac. Ry. Co., 288 U.S. 490, 53 S.Ct. 406, 77 L.Ed. 914 (1933). Here, the Commission's refusal was clearly justified by the failure of Interstate timely to raise the issue, the dubious merit of its claim and the complete absence of any prejudice to Interstate. Nor is it surprising, considering the late date of Interstate's petition for reconsideration, that the Commission set forth no reasons for denying it. Compare Yourga v. United States, 191 F.Supp. 373, 377 (W.D.Pa.1961); Carolina Scenic Coach Lines v. United States, 59 F.Supp. 336 (W.D.N.C.), aff'd per curiam, 326 U.S. 680, 66 S.Ct. 37, 90 L.Ed. 398 (1945).

 The key issue is whether the deposit receipts, used as a mechanism for maintaining the status quo pending application to the I.C.C. for approval, are to be treated as securities within the meaning of § 20a. The dominant Congressional purpose in enacting that section was to protect investors in the securities of railroads and other carriers from the all too frequent abuses of financial manipulation, watered stock, and over-extended capital structures. See Chicago S. Shore & S. Bend R. R. v. United States, 221 F.Supp. 106 (N.D.Ind. 1963); Sharfman, The Interstate Commerce Commission 190 (1931).

Thus it was provided that before a *carrier* could issue any capital stock, bonds, or long term notes, assume liabilities or other obligations, it must apply to the Commission for authority to do so, upon a showing of the corporate purpose underlying the transaction and compatibility with the public interest. The requirement of prior Commission approval has also been held to apply to any transaction by which a carrier changes or affects the terms of some or all of its securities. See United States v. New York, New Haven & Hartford R .R. Co., 276 F.2d 525 (2d Cir. 1960).

 In our view this established body of law does not compel the conclusion that the deposit receipts used here are securities as that term is used in § 20a. First, it should be noted that the deposit receipts were not issued by Transcon with respect to *its* stock, but by the depository bank as a receipt for shares of Queen deposited with it by Queen shareholders. Thus the deposit receipts could scarcely be viewed as securities of Transcon, as Interstate seems to claim, but only as securities of Queen.

The deposit receipts did not affect the capital structure of Queen, or alter the terms of Queen stock to the disadvantage of its shareholders or in violation of its corporate purpose. Nor did they entitle Transcon to any control of Queen prior to Commission action or affect its financial condition. Only when the I.C.C. acted upon Transcon's application for control, an application which also requested authority to issue the Transcon shares necessary to perform the exchange agreement, did Transcon issue any securities. Thus it seems plain that the deposit receipts are not securities requiring § 20a approval prior to issuance, though the Commission has, upon application, accepted jurisdiction over similar receipts and given such approval. See Delaware, L. & W. R. R. Co., Merger, 257 I.C.C. 91 (1944). Moreover, the Commission's action in approving Transcon's issuance of stock necessarily included consideration of the propriety of the deposit receipts and recognized their validity. Compare New York, Chicago & St. Louis R. R. v. Frank, 314 U.S. 360, 62 S.Ct. 258, 86 L.Ed. 277 (1941);

Breeding Motor Freight Lines v. Reconstruction Finance Corp., 172 F.2d 416 (10th Cir. 1949).

■ Finally, it should be noted that the remedy provided for violation of § 20a is that the security shall be void. 49 U.S.C. § 20a(11). Subsection 11 also provides that any holder of a void security who acquired it in due course from any person may sue for damages, and that one who bought directly from the issuing carrier may at his option sue for damages or rescind. Plaintiff does not fit within Subsecution 11, and could not take advantage of its provisions were the deposit receipts void or voidable. It certainly has no such remedy in this proceeding.[26]

### B. Claimed violation of Section 5(4).

Section 5(4) of the Interstate Commerce Act, 49 U.S.C. § 5(4), makes it unlawful for any person to control, or exercise the power of control over, the management of any carrier without obtaining prior approval from the Commission. Interstate asserts that Transcon committed two violations of § 5(4) by first, its purchases of a small number of Queen deposit receipts, and second, through power given Transcon over Queen by the terms of the deposit receipts themselves. We have already affirmed the Commission's finding that

Transcon did not acquire control of Queen through purchases of deposit receipts. (supra, p. 382). Plaintiff's second contention need detain us little longer.

■ Interstate points to the language of the deposit receipts which made the deposit irrevocable except upon the joint consent of Transcon and Queen, and which prohibited either Transcon or Queen from taking any action outside the ordinary course of business without the consent of the other party. These provisions are said to have given Transcon an effective veto power over Queen's operations by preventing Queen's management from making major policy decisions on its own, and by keeping the Queen stockholders locked into the deal with Transcon.[27] In our view, however, these factors would not have warranted a finding by the Commission that Transcon had acquired in fact the power to control the regular operations of Queen. Compare Gilbertville Trucking Co. v. United States, 371 U.S. 115, 83 S.Ct. 217, 9 L.Ed.2d 177 (1962). While the I.C.C. made a general finding that Transcon did not have control of Queen prior to Commission approval, see 101 M.C.C. at 543, there is no specific finding that the terms of the deposit receipts did not serve to pass that power to Transcon. This is not surprising in view of Interstate's

26. We do not understand the decision of the Supreme Court last term in Denver & Rio Grande Western R. R. Co. v. United States, 387 U.S. 485, 87 S.Ct. 1754, 18 L.Ed.2d 905 (1967) to affect our conclusions. There the court held that when a corporation subject to I.C.C. jurisdiction sought approval under § 20a to issue stock, amounting to 20% of its outstanding stock, to another carrier, as part of a program leading to control by the other carrier, the Commission is obligated to consider at that stage in the proceedings whether issuance of the stock to the other carrier would pass control or violate the Clayton Act. We read the case to mean that where an acquisition by one carrier of stock in another carrier comes to the attention of the Commission, it must determine, at the earliest practicable stage, whether the transaction will pass control and

whether it is in the public interest. Here we feel that criterion was met by the I.C.C. determining that the entire transaction was consonant with the National Transportation Policy upon an application seeking authority under both § 20a and § 5(2).

27. While the deposit receipts entitled the holder to receive the dividends from and to vote the underlying Queen shares, his freedom of choice was circumscribed. Queen could not withdraw from the exchange agreement without breaking its contract with Transcon. Nor could it have changed the course of its business without running the risk of violating the deposit agreement. If a holder of Queen deposit receipts became dissatisfied he was free to transfer the receipts to another, but the transferee would remain bound by the terms of the deposit agreement.

failure to present the argument it now makes to the Commission. Even in the doubtful event that a technical violation of § 5(4) could be found to have occurred, the Commission would have been justified, in finding, particularly in light of its conclusion that the transaction was in the public interest, that the transgression did not warrant denying the public of the benefits of the acquisition. See Illinois Central R. Co. v. United States, 263 F.Supp. 421 (N.D.Ill.1966), aff'd 385 U.S. 457, 87 S.Ct. 612, 17 L.Ed. 2d 509 (1967).

C. *Refusal to proceed under § 11 of the Clayton Act.*

During the summer of 1965, several months after the hearings before the trial examiner were closed, Interstate wrote to the Commission claiming that Transcon's purchases of deposit receipts violated § 7 of the Clayton Act, 15 U.S.C. § 18, and requesting the Commission to issue a complaint pursuant to § 11 of that Act, 15 U.S.C. § 21. In November 1965, the Commission replied refusing to take action on its own motion and suggesting that Interstate file a formal complaint. On December 10, 1965, after the examiner's recommended decision had been filed, Interstate filed a complaint alleging that Transcon's purchases of deposit receipts violated the Clayton Act.[28] The Commission dismissed the complaint on the ground that it pertained to facts of record and matters at issue in the control proceedings, which had already gone beyond the hearing stage.

Interstate attacks this action of the Commission as an abdication of its responsibilities under § 11. The core of plaintifff's position is the assertion that Transcon's conduct prior to Commission approval, though after it had applied therefor, should be measured under the standards of the Clayton Act, and not of the Interstate Commerce Act. Applying Clayton Act standards, Interstate asserts that stock purchases by competitors, are

anti-competitive under § 7, and that Transcon's purchases of deposit receipts fall within the proscription of that section. In this court, plaintiff has added the further claim that the deposit receipts froze-out other prospective purchasers of Queen and thus erected a significant barrier to the entry of new competition into the intercity bus industry.

■ The duties of the I.C.C. under the Clayton Act cannot be viewed apart from the provisions of § 5 of the Interstate Commerce Act. Whatever merit there might be to plaintiff's theory if a regulated carrier purchased stock in a competitor and took no further action, that is not what happened here. Transcon negotiated for the stock of the three carriers with a view toward obtaining control only if the Commission approved. Transcon did not simply purchase Queen stock for cash, but in exchange for stock to be issued with Commission approval. Thus, it is apparent that the Commission had the opportunity to examine the transaction on the application under § 20a, and at that time to discharge any duties imposed on it by the Clayton Act. Compare Denver & Rio Grande Western R. R. Co. v. United States, 387 U.S. 485, 87 S.Ct. 1754, 18 L.Ed.2d 905 (1967). To hold in these circumstances that the Commission was obligated to consider separately Interstate's petition under § 11 of the Clayton Act, when the same issues were being fully ventilated in other Commission proceedings involving the same subject matter, would place an unwarranted burden on an already overloaded agency.

■ Moreover, we cannot accept Interstate's argument that the Commission must measure Transcon's pre-approval conduct under the terms of the Clayton Act and not the Interstate Commerce Act. As has been made abundantly clear by the Supreme Court, see, e. g., Penn-Central Merger and N. & W. Inclusion

---

**28.** The complaint was given docket number MC–C 4969 and was served by the Commission on Transcon, Queen, and the other parties to the acquisition proceedings. The complaint was dismissed by Division 3, and reconsideration was denied by the Commission. See notes 1, 2, supra.

Cases, 389 U.S. 486, 498–501, 88 S.Ct. 602, 19 L.Ed.2d 723 (1968); Seaboard Air Line R. R. Co. v. United States, 382 U.S. 154, 86 S.Ct. 277, 15 L.Ed.2d 223 (1965), the principles of the National Transportation Policy, 49 U.S.C. preceding § 1, are the dominant yardstick by which consolidations in the transportation industry are to be measured. Under § 5 of the Interstate Commerce Act, the I.C.C. is given the power to approve a transaction which furthers the National Transportation Policy even though it might otherwise be contrary to the goals of the Clayton Act.

The sometimes contradictory goals of the anti-trust laws and the Interstate Commerce Act require that each transaction be judged on its own facts. Here Interstate makes two specific claims. First, it argues that Transcon acquired control of the assets of Queen in violation of Clayton Act § 7 when the Queen shareholders assented to the exchange agreement. Even assuming this doubtful proposition, in our view the proper test of control is not the incipiency formula of the Clayton Act, but the standards of §§ 5(4), 5(5) of the Interstate Commerce Act. Under those standards the I.C.C. properly found that control had not passed prior to its approval.

■ Interstate's second claim is that the terms of the deposit agreement frozeout potential competitors such as Interstate who wanted to buy Queen. The flaw in this argument is the failure to recognize the key premise underlying the regulated transportation industry that entry must be restricted in order to protect the public interest. To enter the bus industry, a potential competitor would either have to apply for certificates of convenience and necessity authorizing the new service, or purchase an extant carrier and obtain approval of the transaction from the Commission. In light of this statutory structure, the deposit receipt mechanism used here can hardly be said to have erected any additional barriers to the entry of new competition.

Giving proper effect to the necessary interaction between the Clayton and Interstate Commerce Acts, we find that the Commission acted well within its discretion in dismissing Interstate's complaint under the Clayton Act since the matters raised there were fully considered under correct legal standards in the control proceedings. There is no requirement that an agency cover the same ground twice.

*D. The "duopoly" theory.*

Interstate's overriding argument is that by approving these acquisitions the I.C.C. has frozen the intercity bus industry for all time into a "duopoly" dominated by Greyhound and Transcon. According to plaintiff, with the inclusion of the southeastern Trailways carriers into Transcon, there are no longer enough independent companies left to form a third nationwide bus company. This result is said to violate the anti-trust laws and require reversal of the Commission's order.

■ Much of plaintiff's argument is based on the erroneous legal premise that the Commission must give controlling weight to anti-trust considerations. As the Supreme Court has repeatedly held, while the Commission cannot ignore the policies of the anti-trust laws, the primary considerations are the standards set forth in § 5(2) (c) of the Interstate Commerce Act. See Penn-Central Merger and N. & W. Inclusion Cases, 389 U.S. 486, 498–501, 88 S.Ct. 602, 19 L.Ed. 2d 723 (1968); Seaboard Air Line R. R. Co. v. United States, 382 U.S. 154, 86 S.Ct. 277, 15 L.Ed.2d 223 (1965); Minneapolis & St. Louis Ry. Co. v. United States, 361 U.S. 173, 80 S.Ct. 229, 4 L.Ed.2d 223 (1959); McLean Trucking Co. v. United States, 321 U.S. 67, 64 S.Ct. 370, 88 L.Ed. 544 (1944). In its report approving Transcon's application the Commission carefully explored the effect of the consolidations on the public interest and gave due weight to anti-trust considerations.

■ First, the Commission noted that the routes of Transcon and the three acquired companies overlapped only slightly, so there was almost no duplication in the service they provided. It was shown that substantial savings

could be achieved by joint operation of the companies through centralizing their bookkeeping, volume purchasing, inventory reduction, and more efficient equipment utilization. Transcon's control would also result in better service to the public by the establishment of more through-service schedules replacing present cumbersome and inadequate pooling arrangements. Finally, better terminal facilities could be expected from centralization of policy control of joint terminals in Transcon, and from new terminals which Transcon could build with its superior financial resources. These and the other findings relied on by the Commission amply support its conclusion that the acquisitions are in the public interest.

Turning to Interstate's "third force" argument, the Commission first noted that it was speculative at best.[29] Evidence at the hearings had shown that many previous attempts to consolidate the southeastern Trailways carriers had failed, and there was no indication that Interstate's efforts would succeed. More importantly, Interstate had not filed any application to purchase or control these carriers, or offered to do so on terms equivalent to Transcon's. Compare Minneapolis & St. Louis Ry. Co. v. United States, 361 U.S. 173, 80 S.Ct. 229, 4 L.Ed.2d 223 (1959). Indeed, it settled and released any rights it might have had to purchase Queen.

Finally, the Commission rejected Interstate's "duopoly" claim, noting that the intercity bus industry had long been dominated by Greyhound with Trailways a poor second.[30] Nor was there any real doubt that Transcon was the most powerful member of the N.T.S. Group. The Commission concluded that the public interest would be best served by strengthening Transcon's hand in N.T.S. in order to make that system a more effective competitor of Greyhound. This was in accord with the similar long-standing I.C.C. policy of encouraging "the unification of the properties of carriers under common control in order to foster efficiency and to lessen wasteful transportation in furtherance of the national transportation policy." 101 M.C.C. at 549. We have carefully reviewed the record and have concluded that the Commission's findings are based on substantial evidence and fully support its conclusion that the acquisitions are in the public interest.

### V.

We have considered and determined the merits of the various contentions made by Interstate for the reason that the propriety of the Commission's judgment ought not to be left to speculation in face of the numerous charges of fraud. In doing so, however, we wish it understood that we entertain serious doubts that Interstate has standing to raise its claims in this action in any event.[31]

---

**29.** Interstate has never made it clear whether its "third force" of intercity bus carriers was to be built by separating the southeastern carriers from N.T.S. or from within N.T.S. If they were separated from N.T.S. this would leave Greyhound as the only carrier group offering nationwide service. If they were to remain in N.T.S. then the question is not one of duopoly, since that condition would still be present, but whether Transcon or Interstate was better fit to control a strengthened N.T.S. There is no persuasive evidence that the stockholders of Queen or the other companies would be willing to deal with Interstate if Transcon's application were rejected. Nor is there any evidence as to Interstate's ability to operate a bus system. Finally, it should be noted that even if

a duopoly is assumed to exist, there is no certainty that the industry will retain that structure for all time. It is certainly possible that if increases in intercity bus traffic warrant, the I.C.C. would, upon proper study, create a "third force" by certificating new or additional routes for new carriers.

**30.** The record showed that in 1963 Greyhound earned 61% of the operating revenue of Class 1 Intercity Bus Carriers. Trailways earned 23%, which included the 11.27% earned by Transcon. Including the acquired companies would make Transcon's share 18%.

**31.** This is not to say that plaintiff lacks standing to assert such private remedies, if any, as it may have under the antitrust laws. See Carnation Co. v. Pa-

The touchstone for standing to sue under the Interstate Commerce Act is whether the Commission action threatens or produces legal injury. Pittsburgh & W. Va. Ry. Co. v. United States, 281 U.S. 479, 50 S.Ct. 378, 74 L.Ed. 980 (1930); Moffat Tunnel League v. United States, 289 U.S. 113, 53 S.Ct. 543, 77 L.Ed. 1069 (1933); Edward Hines Yellow Pine Trustee v. United States, 263 U.S. 143, 44 S.Ct. 72, 68 L.Ed. 216 (1923). The fact of intervention before the Commission is not enough by itself to establish standing. See Seatrain Lines, Inc. v. United States, 152 F.Supp. 619 (D.Del.), aff'd per curiam, 355 U.S. 181, 78 S.Ct. 265, 2 L.Ed.2d 186 (1957). Standing is accorded to competitors whose businesses are affected by Commission action as, for example, when new operating rights are granted or new services authorized. See American Trucking Ass'ns v. United States, 364 U.S. 1, 80 S.Ct. 1570, 4 L.Ed.2d 1527 (1960); Alton R. R. Co. v. United States, 313 U.S. 15, 62 S.Ct. 432, 86 L.Ed. 586 (1942). Shippers, states, counties or groups, and others, whose interests are affected may also be given standing. See 28 U.S.C. § 2323.

Under these standards it seems plain to us that plaintiff has no interest at all in the acquisition of Virginia and Safeway. Interstate is not a competitor, a shipper, or even a resident of the areas served by these companies. Its sole connection with the bus industry—that it once claimed to have a contract to purchase Queen—is not enough to entitle it to challenge the acquisitions of Virginia and Safeway.

Interstate's position vis-à-vis the Queen transaction is somewhat less remote. It claims to have had a contract to purchase Queen which was allegedly breached at the instance of Transcon.

Had it gone before the Commission in that posture and filed a rival application to purchase Queen upon equitable terms satisfactory to the Commission, there is little doubt that it would have had standing to attack the resulting order. But instead of proceeding in this manner, Interstate chose to sue Queen and the Queen shareholders for breach of contract in the federal court for the Western District of North Carolina. It is significant that that suit did not ask for specific performance but sought damages only. After the hearings on Transcon's application were completed and before the examiner's report was filed, Interstate settled its suit with Queen for $25,000. The terms of settlement required Interstate to give releases to Queen, the Queen shareholders and Transcon, and to agree to withdraw its opposition to the acquisition. Pursuant to this agreement Interstate wrote the I.C.C. and asked to withdraw as a party to this case.

Shortly thereafter, claiming that the settlement had been procured by fraud, and that Burt, its president who controlled it, was not authorized to release Transcon, Interstate cancelled its withdrawal from these proceedings and has been vigorously pursuing the case ever since.[32] At no time has Interstate ever moved to set aside the settlements in the federal court in North Carolina where they were approved and entered, or for that matter offered to return the consideration it received for these agreements.

Thus, while Interstate might have had standing under its contract to purchase Queen, it now appears that it contracted that right away. The releases required by the settlement, if valid, completely discharge any liability the Queen shareholders might have had to sell their stock to Interstate. While we do not pass

cific Westbound Conference. 383 U.S. 213, 932, 86 S.Ct. 781, 15 L.Ed.2d 709, 851 (1966); Utah Gas Pipeline Corp. v. El Paso Natural Gas Co., 233 F.Supp. 955 (D.Utah 1964).

32. The Commission steadfastly refused to consider the validity of Interstate's al-

leged contract to purchase Queen, or whether the settlement and releases were obtained by fraud. The I.C.C. felt that these were private matters to be resolved in court between the parties. These rulings of the Commission were correct.

upon the question of the validity of the releases, we think that the proper way to raise that question is by proceedings to set aside the settlement and order of dismissal in Interstate's action against Queen in the Western District of North Carolina where the settlement was approved and the order entered.

## VI.

In addition to the issues we have discussed, Interstate raises a number of other questions. We have considered all of these in our review of the record and find none of them to have merit or warrant discussion.

We hold that the Commission committed no errors of law requiring reversal and that its findings and conclusions and the order under review are fully supported by substantial evidence on the record as a whole. The order of the I.C.C. under review is in all respects affirmed.

It is so ordered.