389 F.2d 517
 BUTLER AVIATION COMPANY, Petitioner,
Lear Jet Industries, Inc., Intervenor,
v.
CIVIL AERONAUTICS BOARD, Respondent,
Eastern Air Lines, Inc., and Remmert-Werner, Inc., Intervenors.
 No. 310.
 Docket 31884.
 United States Court of Appeals Second Circuit.
 Argued January 5, 1968.
 Decided January 31, 1968.
 
 John H. Quinn, Jr., Washington, D. C. (Lear, Scoutt & Rasenberger, Washington, D. C.), for petitioner.
 George S. Leonard (Leonard, Clammer, Fluest & Redmon, Washington, D. C.), for intervenor Lear Jet Industries, Inc.
 Warren L. Sharfman, Associate Gen. Counsel (Donald F. Turner, Asst. Atty. Gen., Howard E. Shapiro, Atty., Joseph B. Goldman, Gen. Counsel, O. D. Ozment, Deputy Gen. Counsel, Gary J. Edles, Atty., Washington, D. C.), for respondent.
 Berl I. Bernhard, Washington, D. C. (Verner, Liipfert & Bernhard, Dennis E. Curtis, Washington, D. C., on brief), for intervenor Remmert-Werner, Inc.
 Robert W. Oliver, Washington, D. C. (Reavis, Pogue, Neal & Rose, Washington, D. C., Brian C. Elmer, Washington, D. C., on brief), for intervenor Eastern Air Lines. Inc.
 Before MOORE, FRIENDLY and KAUFMAN, Circuit Judges.
 FRIENDLY, Circuit Judge:
 
 
 1
 Butler Aviation Company, a "fixed base operator," petitioned for review of an order under § 408 of the Federal Aviation Act, 49 U.S.C. § 1378, approving the acquisition by Eastern Air Lines, Inc. (EAL) of all the stock of Remmert-Werner, Inc. (R-W) through issuance of its own stock. Lear Jet Industries, Inc., a manufacturer and distributor of executive jet aircraft, intervened in support of Butler's petition and will be considered as a petitioner. EAL and R-W intervened in support of the order. R-W is sales agent for a competing executive jet aircraft, the Sabreliner, manufactured by North American Aviation, and is also a leading fixed base operator. Examiner Keith, whose initial decision the Civil Aeronautics Board permitted to become effective without review, see Reorganization Plan No. 3 of 1961, 75 Stat. 837, and Rule 28(a) (2) of the Board's Rules of Practice, attached various conditions to the approval, the only one having much practical significance being that neither EAL nor R-W would engage in fixed base operations at any airport served by EAL additional to those where either now engages in such business, without prior Board approval. He declined to attach a further condition, proposed by the Board's Bureau of Operating Rights, supported by Butler and accepted by EAL, that EAL should not claim antitrust immunity under § 414 of the Act outside the field of transportation. Jurisdiction was retained "for the purpose of imposing, at any time, with or without a hearing, such further conditions as may be found just and reasonable."
 
 
 2
 Although the Civil Aeronautics Act of 1938, 52 Stat. 973, whose economic regulatory provisions were carried over without substantial change into the Federal Aviation Act of 1958, 72 Stat. 731, was generally modeled upon the Motor Carrier Act of 1935, 49 Stat. 543, the provisions with respect to acquisitions of control differ in some respects material to the instant case. Whereas § 213(a) of the Motor Carrier Act, 49 Stat. 555-557, since incorporated in § 5 of the Interstate Commerce Act, 49 U.S.C. § 5, dealt only with transactions affecting the ownership or control of motor carriers, § 408(a) of the Federal Aviation Act also includes acquisitions by air carriers of persons "engaged in any phase of aeronautics otherwise than as an air carrier."[1] And while the Motor Carrier Act followed § 5 of the Interstate Commerce Act in making "public interest" the sole criterion of approval, § 408(b) contains a proviso prohibiting approval of any transaction "which would result in creating a monopoly or monopolies and thereby restrain competition or jeopardize another carrier not a party * * *" to the transaction.
 
 
 3
 Although the proviso's mandate is sharp, its office is exceedingly limited, as the Board early noted. United Air Lines-Western Air Express, Interchange of Equipment, 1 CAA 723, 734 (1940). Restraint of competition or jeopardy to another air carrier is not enough to trigger the proviso unless brought about by the creation of a monopoly; per contra the creation of a monopoly is not enough unless it would restrain competition or jeopardize a nonparty air carrier. However, the Board has escaped the straitjacket that would have been imposed by reading the proviso as a limit on its consideration of competition in passing on applications under § 408. It has properly concluded, in light of the immunity from the antitrust laws conferred by § 414, that it must consider anti-competitive effects less extreme than those limned in the proviso in determining whether the transaction will "be consistent with the public interest" as defined in § 102, see, e. g., American Airlines, Acquisisition of Control of Mid-Continent Airlines, 7 C.A.B. 365, 371-372, 377-378 (1946), in much the same way as other regulatory agencies have been held required to do. See McLean Trucking Co. v. United States, 321 U.S. 67, 64 S.Ct. 370, 88 L.Ed. 544 (1944); Minneapolis & St. Louis Ry. Co. v. United States, 361 U.S. 173, 186, 80 S.Ct. 229, 4 L.Ed.2d 223 (1960); Seaboard Air Line R. Co. v. United States, 382 U.S. 154, 156, 86 S.Ct. 277, 15 L.Ed.2d 223 (1965); Denver & R. G. W. R. Co. v. United States, 387 U.S. 485, 492-498, 87 S.Ct. 1754, 18 L.Ed.2d 905 (1967). The true construction of § 408(b) as to transactions with anticompetitive effects thus is that the Board cannot approve a transaction if its effects will be so extreme as to violate the proviso but must approve others if, but only if, it finds the disadvantage of any curtailment of competition to be outweighed by "the advantages of improved service." McLean Trucking Co. v. United States, supra, 321 U.S. at 87, 64 S.Ct. 370, 88 L.Ed. 544.
 
 
 4
 Petitioners point out that here "the advantages of improved service" are minimal. The only advantage to air transportation lies in affording EAL the added strength from what it expects to be a good investment in a related activity where it can usefully employ its management skills, and the advantages to "civil aeronautics," see § 102(f), lie simply in putting EAL's strength behind an already flourishing R-W. But the Board was warranted in finding that any disadvantages are equally small.
 
 
 5
 Indeed, so far as concerns the sale of executive jet aircraft, there are none. The number of competitors in that line of commerce is a function of the number of competitive manufacturers. It is scarcely conceivable that the position of the North American jet, presently constituting only 14.5% of the market, will become so dominant as a result of being sold by R-W under an EAL wing as to discourage other aircraft manufacturers from endeavoring to share in or to enlarge the pie. Unlike the identical liquid bleaches in FTC v. Procter & Gamble Co., 386 U.S. 568, 87 S.Ct. 1224, 18 L.Ed.2d 303 (1967), a decision heavily relied on by Lear, executive jets vary substantially in capacity, take-off weight, speed, range and price — the latter running from $500,000 to $3,100,000.[2] A corporation considering such a purchase is likely to make a rational and well-considered choice as to which airplane best suits its requirements rather than yield to a salesman's blandishments. Indeed, Lear, with assets of only $31 million, was able to capture 30.1% of the market in 1965-66, while its better-known and much better endowed competitors, Pan American World Airways selling the Dessault Falcon and Lockheed selling its Jetstar, had to settle for 12% and 10% respectively. Lear's other contention, that the acquisition is detrimental to air transportation since EAL will have an incentive to divert common carrier traffic to executive jets, borders on the frivolous. The cost differential between the two forms of travel is enormous; the usefulness of the executive jet lies in affording service between points where scheduled air transportation is nonexistent or inadequate, and in accommodating executives whose time is — or is fancied to be — so valuable as not to brook the necessities of awaiting schedules and other airport delays the ordinary American must endure.
 
 
 6
 Fixed base operation, perhaps better described as the aviation service industry, was defined by the Examiner as covering "such activities as the sale of aircraft fuel, the delivery of fuel into aircraft (as agent for oil companies), the provision of hangar space, aircraft maintenance and repair, sale of aircraft, and sale and installation of avionics, other aircraft equipment, performance of `turnaround' services of aircraft, and other services * * *." These services are performed primarily for operators of private aircraft, whether business or pleasure, and also for "supplemental air carriers" and for off-route operations of air carriers. The industry includes some 3300 operators. Most have facilities at only one airport, none operates at more than nine,[3] and only six are of substantial size. So far as concerns the enroute servicing of aircraft, competition is necessarily limited to operators having facilities at a particular airport. The record does not disclose how many airports are served by more than one fixed base operator, but we gather that the extent of such competition is small and that, so far as this aspect of the case is concerned, the fear is rather that the strengthened R-W may outbid others when new airports for private aircraft are activated or concessions at existing fields expire. Due to the mobility of the airplane, competition as to maintenance, overhaul and the installation of new equipment is more widespread.
 
 
 7
 The Examiner was warranted in concluding that the resemblances again asserted to FTC v. Procter & Gamble Co., supra, were more apparent than real. There was no evidence that EAL was a likely entrant, let alone "the most likely entrant," 386 U.S. at 580, 87 S.Ct. 1224, 18 L.Ed.2d 303, into aviation service industry; to the contrary there was no suggestion that EAL or any other major carrier had any interest whatever in entering the servicing end of the business on its own account. Neither is there any "reason to suppose" that other firms "would become more cautious in competing due to their fear of retaliation," 386 U.S. at 578, 87 S.Ct. at 1230, by an EAL-owned R-W; it is quite as reasonable to assume "that smaller firms would become more aggressive in competing" due to their fear that otherwise the supposedly now more efficient R-W would absorb their markets. 386 U.S. at 584, 87 S.Ct. 1224 (concurring opinion of Mr. Justice Harlan). The advertising and marketing of EAL's transportation services do not have the ready blend with fixed base operations that existed between Procter & Gamble's detergents and Clorox' liquid bleach. It is rather hard to imagine a television commercial devoted to extolling the charms of Florida palms and sands including a plug for R-W's fueling operations. Indeed there is no evidence that the two services are advertised in the same media, and common sense suggests that generally they will not be. While large financial resources would enable EAL to operate R-W on an uneconomical basis by undercharging customers or overbidding for leases, as any other wealthy owner could, the structure of the aviation service industry would make such ploys singularly unrewarding.
 
 
 8
 All that remains is the Examiner's refusal to adopt the proposal of the Bureau of Operating Rights that EAL should not claim antitrust immunity for the acquisition outside the field of transportation.[4] The question is both novel and difficult, so much so that we must confess surprise at the Board's having declined review. Literally § 414 is mandatory; it says that any person affected by an order under § 408 "shall be, and is hereby, relieved from the operations of the `antitrust laws' * * * insofar as may be necessary to enable such person to do anything authorized, approved, or required by such order." Hence we readily agree that a person seeking approval under § 408 is entitled to insist that the Board must accord the full benefits Congress directed if he meets the statutory tests. But since EAL did not so insist, the Examiner's statement "that the Board cannot require Eastern to waive the antitrust immunity conferred by Section 414," while correct, is inapposite.[5] At first blush it seems peculiar that the Board should be required to thrust on EAL antitrust immunity it was willing not to achieve — especially in a field peripheral to the Board's primary concerns.
 
 
 9
 While not free from doubt, we nevertheless believe the Examiner reached the right result. We read § 414 and similar provisions in other statutes, such as § 5(11) of the Interstate Commerce Act and § 15 of the Shipping Act,[6] as declaring that in the areas there delimited the public interest demands that if a transaction has survived examination by the appropriate regulatory agency, antitrust peace shall prevail even if a party is willing to settle for less. As said in Pan American World Airways, Inc. v. United States, 371 U.S. 296, 309, 83 S.Ct. 476, 484, 9 L.Ed.2d 325 (1963), "It would also be odd to conclude that an affiliation between a common carrier and an air carrier that passed muster under § 408 should run afoul of the antitrust laws. Whether or not transactions of that character meet the standards of competition and monopoly provided by the Act is peculiarly a question for the Board, subject of course to judicial review as provided in 49 U.S.C. § 1486." A further reason for such a reading is that Congress — had it considered the matter — might well have wished to guard agencies against a subconscious temptation to neglect thorough assessment of anticompetitive considerations on the basis that the transaction would remain open to later attack by the Attorney General or in a private suit — remedies too slow and doubtful in these areas of particular public concern. What post-acquisition activities are within the immunity granted by § 414 is a different question, cf. Trans World Airlines, Inc. v. Hughes, 332 F.2d 602, 606-610 (2 Cir. 1964), cert. dismissed as improvidently granted, 380 U.S. 248-249, 85 S.Ct. 934, 13 L.Ed.2d 817, 818 (1965), which we have no occasion here to answer.
 
 
 10
 The petition to review is denied.
 
 
 
 Notes:
 
 
 [1]
 The broader coverage stemmed from the investigation of air-mail contracts conducted by then Senator Black, which led to the cancellation of the domestic airmail contracts, and § 7 of the consequent Act of June 12, 1934, 48 Stat. 933, 936
 
 
 [2]
 The Sabreliner sells for $1,050,000
 
 
 [3]
 R-W operates at eight; Butler at nine
 
 
 [4]
 The Examiner's discussion was as follows:
 "However, if as the Bureau and Butler urge, the Board can legally consider the impact of the acquisition on the areas of business engaged in by R-W, then it would seem to follow that the Board cannot require Eastern to waive the antitrust immunity conferred by Section 414. This section automatically grants antitrust immunity to a person affected by an order made under Section 408 insofar as may be necessary to enable such person to do anything authorized, approved, or required by such order; and it is doubtful that the Board can prevent the operation of this section by adopting a condition such as that recommended by the Bureau.
 "On the other hand, if as Eastern and R-W argue, the Board has no jurisdiction to consider matters outside of the field of air transportation, then any determination of monopoly or restraint of competition with reference to the executive aircraft industry and the aviation service business is superfluous and a nullity, and therefore, cannot bring into operation Section 414. Accordingly, the adoption of the Bureau's recommended condition requiring Eastern to waive immunity would serve no useful purpose and is therefore denied."
 
 
 [5]
 The Examiner should also not have relied on the argument of EAL and R-W noted in the second paragraph of the preceding footnote. Whether or not the antimonopoly proviso of § 408(b) applies "outside of the field of air transportation," assessment of anticompetitive factors essential to determination of consistency with the public interest necessarily extends to any phase of aeronautics the transaction will affect. Even if that were not true, the Examiner's "therefore" would not follow
 
 
 [6]
 See also the final paragraph of § 7 of the Clayton Act. But see California v. F. P. C., 369 U.S. 482, 82 S.Ct. 901, 8 L.Ed.2d 54 (1962)