**INTERSTATE INVESTORS, INC.,**
**Plaintiff,**

**v.**

**TRANSCONTINENTAL BUS SYSTEM, INC., now known as TCO Industries, Inc., defendant (formerly intervenor-defendant), Queen City Coach Company, General Realty & Insurance Corporation, M. E. Moore, N. W. Scheitel, Estate of L. A. Love, added defendants, Defendants.**

**No. 66 Civ. 3004.**

United States District Court,
S. D. New York.

March 26, 1970.

Royall, Koegel & Wells, New York City, Frederick W. P. Lorenzen, William S. Greenawalt, New York City, of counsel, for plaintiff.

Lord, Day & Lord, New York City, John W. Castles, 3d, Wendell Davis, Jr., New York City, of counsel, for all defendants other than Estate of L. A. Love.

Richard J. Burke, New York City, for L. A. Love, Jr., et al., as Executors of Estate of L. A. Love.

## OPINION

LASKER, District Judge.

The defendants move to dismiss the complaint or, in the alternative, for summary judgment in this antitrust action which constitutes the latest assault on the validity of an interstate bus merger which occurred in 1964. In that year Transcontinental Bus System, Inc. ("Transcon") acquired control of Queen City Coach Company ("Queen") and certain of its subsidiaries. The plaintiff, Interstate Investors, Inc. ("Investors"), whose efforts to acquire Queen had been rejected, sued Queen in the United States District Court for the Western District of North Carolina. That suit was settled and releases were given by Investors not only to Queen and others, but to Transcon. During the course of the North Carolina action, Investors intervened in proceedings before the Interstate Commerce Commission ("I.C.C." or "the Commission") which had been brought by Transcon to secure approval of the Queen acquisition. The hearing examiner rejected Investors' attack on the Transcon-Queen marriage; the I.C.C. affirmed the examiner. Investors then sued before a three-judge court in this District to enjoin or set aside the Commission's orders, filing a complaint which contained as item VI a section entitled "Antitrust Aspects of the Complaint." The three-judge court affirmed the Commission's orders and dismissed the antitrust aspect of the complaint "without prejudice to the filing within sixty days of an amended complaint stating the private claims for relief only to be heard before a single district judge." Interstate Investors, Inc. v. United States of America, Interstate Commerce Commission and Transcontinental Bus System, Inc., 287 F.Supp. 374, 385 (S.D.N. Y.1968). The Supreme Court affirmed without opinion. Interstate Investors, Inc. v. United States et al., 393 U.S. 479, 89 S.Ct. 707, 21 L.Ed.2d 687 (1969).

The present motion is addressed to the amended complaint authorized in the opinion of the three-judge court. It alleges violations of the antitrust laws founded on overt acts, including the making of a written contract by Transcon and defendant Queen by which the former would acquire the latter; the formation of an unwritten, secret agreement between Transcon and certain shareholders of Queen by which Transcon would purchase for cash from the shareholders certain deposit receipts evidencing stock interest in Queen; the submission of false and misleading misrepresentations to the Internal Revenue Service; the giving of false testimony before the Interstate Commerce Commission by defendants Moore and Schei-

tel, who are officers of Transcon, and by defendant Love, who was an officer of Queen; and the unlawful acquisition of control by Transcon over Queen prior to I.C.C. approval of the proposed agreement between the two.

Defendants Transcon, Queen, Moore, and General Realty and Insurance Company have moved to dismiss the complaint or, in the alternative, for summary judgment, on the grounds of general release; lack of jurisdiction; improper venue; failure to bring this action within the time prescribed by the three-judge court which previously heard this case; res judicata; and immunity from liability, conferred by Section 5 (11) of the Interstate Commerce Act ("the Act"), 49 U.S.C. § 5. I hold that the latter provision, which is set forth infra, entitles defendants to summary judgment. This holding is premised upon the fact that the I.C.C., which approved the acquisition of Queen, properly took into account the precise ingredients of this action—i. e., the above mentioned overt acts—and thus its approval bars recovery here.

In order to understand the "precise ingredients" of the case it becomes essential to review in detail the factual background and history of the litigation. The picture that emerges is that of an aggrieved suitor whose rejected advances have become an obsession. Investors and Transcon both wooed Queen. Transcon won. Investors lost. Stung by its rejection, Investors has engaged in a continuous campaign to undo the Transcon-Queen marriage. However, Transcon and Queen and the remaining defendants are entitled under Section 5(11) of the Act to protection from further attack. The motion for summary judgment is granted.[1]

## I. FACTUAL BACKGROUND AND HISTORY OF THE LITIGATION

In 1964, the Greyhound System dominated the nationwide, intercity bus industry.[2] At that time, and now, Transcon was Greyhound's major competitor, although it was only one-fifth the size of Greyhound. Transcon was the largest member of the National Trailways Bus System ("N.T.S."), a non-profit association of separate and independent bus carriers which have adopted Trailways as a common name, use uniform symbols for identification, share joint terminals, and coordinate many essential business functions, including advertising and purchasing. For several years prior to 1964, Transcon had sought control of other N.T.S. members, and had conducted negotiations with the major stockholders of defendant Queen City Coach Company, which itself controlled subsidiary bus carriers. Queen had routes in the southeastern United States, the only region where Transcon lacked through north-south connections.

Investors and its president, William Burt, also engaged in negotiations with Queen stockholders, beginning in August 1963. Investors was not then a bus operator, but it hoped to acquire existing carriers running along the Eastern seaboard and weld them into the foundation for what Burt described as a "third force" to compete with Greyhound and Trailways. Investors maintains that the Burt-Queen negotiations culminated in late March, 1964, in an oral agreement for Investors to purchase all of the stock of Queen and defendant General Realty

1. Because § 5(11) applies to this case, it is not necessary to deal with the Estate of L. A. Love's separately-submitted motion to dismiss for lack of jurisdiction. Likewise, defendant Scheitel, though not a party to these motions, is protected by § 5(11). Finally, since summary judgment for all defendants is required by § 5(11), there is no need to deal with the other grounds offered by defendants.

2. The following background information also appears, in greater detail, in the opinion of the three-judge district court which previously ruled upon related aspects of this case. See Interstate Investors, Inc. v. United States, 287 F. Supp. 374, 377–382 (S.D.N.Y.1968).

and Insurance Corporation ("GRIC")[3] for approximately $8,000,000, in cash.

When Transcon learned of the possible Queen-Investors deal, it "immediately started negotiating in earnest" with Queen.[4] The president of Queen, Mr. L. A. Love (whose estate is a defendant here) by a letter to Transcon dated April 28, 1964, proposed an arrangement by which Transcon would purchase Queen for approximately the same price which Interstate had offered—$8,000,000. But whereas Investors had offered cash, the Queen-Transcon transaction would be effectuated by an exchange of stock and would be contingent upon four conditions, one of which was a commitment by Transcon to buy back its stock from those Queen stockholders who wanted cash.

On May 21, 1964, the Queen board accepted a counter offer by Transcon, dated May 16, 1964, which did not mention any of the conditions specified in Queen's April 28 letter. The May 21 purchase agreement provided for a depositary receipts arrangement by which Queen's stockholders were to deliver their Queen shares to a named bank which would then issue a receipt reflecting the number of shares owned by that stockholder. The bank would hold the stock pending determination of Transcon's application to the Interstate Commerce Commission for approval of control over the Queen group. If the I.C.C. approved the acquisition, the deposited stock would be transferred to Transcon, which in turn would issue to the Queen shareholders 7.25 shares of its common stock for each share of Queen stock. During the period of the deposit, the voting and dividend rights to the Queen stock remained in the holders of the receipts. Pending approval, Queen could only engage in transactions within its ordinary course of business, while Transcon was barred from taking any action which would dilute the value of its common stock. It is this deposit receipts arrangement which forms the core of Investors' suit here. Investors claims that it enabled Transcon illegally to control Queen even before the Commission approved the formal acquisition, that it prevented others, including Investors, from entering the industry, and that it led to false misrepresentations before the Commission and the Internal Revenue Service.

Both the deposit receipts arrangement and Transcon's application to the I.C.C. for approval of control, under Section 5 of the Act, were conditioned upon a ruling from the Internal Revenue Service that the exchange of stock was tax-free. Transcon applied to the I.C.C. for control of Queen on June 5, 1964. The application was consolidated with another Transcon request for authorization to acquire control of certain other bus companies. The I.C.C. examiner began hearings on Transcon's control application on September 9, 1964.

In August 1964, Investors had already filed two actions against Queen and several major Queen stockholders, including L. A. Love, in the United States District Court for the Western District of North Carolina. Investors charged breach of its alleged contract with Queen and tortious interference with that contract. It did not allege any antitrust violations, and did not name Transcon as a defendant.

In an affidavit submitted on the instant motion, Investors' president, William Burt, asserts that "[a]t the time plaintiff commenced these actions [i. e., the August 1964 breach of contract actions] neither plaintiff nor its President had any knowledge that Transcon had acted in contravention of the plaintiff's rights." (Burt Aff., Par. 34.) However, in the same affidavit Burt also avers that "[p]laintiff received a report as early as June 10, 1964 that * * *

---

3. GRIC owned terminal facilities used by Queen, as well as one-third of Georgia-Florida Coaches, a connecting carrier forming a part of the Queen group. The Boards of Directors of Queen and GRIC were almost identical.

4. Interstate Investors, supra, 287 F.Supp. at 379.

there was a secret agreement between Transcon and * * * [certain] shareholders [of Queen and GRIC], whereby Transcon had agreed to secretly repurchase the stock for cash." (Burt. Aff., Par. 36.) Burt further states that, because he believed there was such a secret agreement, when the Commission hearings opened he "cross-examined the witnesses * * * to discover whether the defendant Transcon was in fact purchasing for cash the depositary receipts issued to the participating stockholders of Queen and GRIC." (Burt Aff., Par. 37.)

During the summer of 1964, and prior to the commencement of the I.C.C. hearings, some of the Queen shareholders *did,* in fact, sell their deposit receipts for cash. Coupled with sales made after the hearings closed, a total of less than 10% of the Queen shares were involved. The purchaser of these shares was Highway Insurance of Switzerland ("Highway"), a corporation found by the I.C.C. to be presumptively controlled by Transcon.[5] Investors claims here that these purchases were secret, pre-arranged, and part of a conspiracy to prevent it from acquiring Queen. Investors argues that the purchases enabled Transcon to satisfy the condition specified by Queen in its April 28, 1964 letter to Transcon but omitted in the May 21, 1964 contract, viz., that Transcon commit itself to buying back its stock from those Queen stockholders who wanted cash. At the same time, Investors argues, it enabled defendants to consummate the acquisition without incurring tax liability.

As Burt's affidavit indicated, supra, at the I.C.C. hearings Investors questioned Transcon's witnesses in an effort to establish the existence of a secret agreement between Transcon and the Queen stockholders. Transcon's president, M. E. Moore, and its vice-president, N. W. Scheitel, both testified, in substance, that Transcon had not agreed to make a market for the deposit receipts. Scheitel also answered "I don't know who bought it" to a question which remains ambiguous—plaintiff claiming the question referred to the deposit receipts, and defendants claiming it referred to Queen stock.[6] Plaintiff claims that the testimony of Moore and Scheitel was false in that they not only committed themselves to making a market for the receipts, but personally arranged for their purchase.

The I.C.C. hearings were concluded on October 29, 1964. In January 1965, the defendants in the North Carolina actions moved for summary judgment. However, on February 18, 1965, before Chief Judge Craven, who was presiding over the matter, rendered a decision, a settlement was reached. In exchange for $24,425 in cash, Mr. Burt discharged Queen and its shareholders from all liability and executed eight general releases, including one to Transcon. The release discharged Transcon from all claims of Investors

> "growing out of negotiations and efforts by Transcontinental Bus System, Inc., to acquire stock in Queen City Coach Company and General Realty and Insurance Corporation; or out of its acquisition of said stock." (Defendants' Ex. K.)

In addition, pursuant to the settlement, Investors petitioned the I.C.C. for leave to withdraw from the "control proceedings" on Transcon's application. Shortly thereafter Investors requested that its petition be held in abeyance pending further authorization; no such authorization was given.

It was not until June 15, 1965 that the next episode in the saga occurred. On that date Transcon filed as an exhibit with the I.C.C. a ruling letter from the Internal Revenue Service to Queen. Transcon sent a copy of the letter to Burt. The letter contained the following statement (indicated as emanating from Transcon):

> "Transcontinental does not own stock (or depositary receipts representing stock) of Queen or Realty. However, Highway Insurance Company, of Zur-

5. *Id.,* note 10, at 380.

6. *Id.,* at 380–381.

ich, Switzerland, a wholly-owned subsidiary of Western Sales, Limited * * * 49 percent of the stock of which is owned by Transcontinental, has purchased depositary receipts * * * of Queen and * * * Realty * * *.

"It is stated that there is no commitment, formal or informal, by Transcontinental or any one acting in its behalf to purchase Transcontinental stock from any of the shareholders of Queen or Realty after consummation of the proposed exchange, or to purchase depositary receipts before that time."

The letter then ruled that the transaction qualified as a Section 368(b) tax-free reorganization. (Plaintiff's Ex. 11.)

Although Burt had received a report more than one year earlier that Transcon had secretly agreed to repurchase the stock for cash, supra, Investors (by Burt) maintains that this letter from the Internal Revenue Service "for the first time disclosed some connection between the defendant Transcon and the cash purchase of the depositary receipts." As a result, Investors "made repeated attempts to have the I.C.C. Hearing Examiner reopen the hearings" and requested by letter dated December 8, 1965, that the Commission issue a complaint pursuant to Section 11 of the Clayton Act, 15 U.S.C. § 21.[7] The Commission refused to take action on its own motion, and suggested instead that Investors file a formal complaint. Before Investors did so, however, the hearing examiner issued his report, on November 1, 1965.[8] A summary of the report is provided below, but its conclusion may be stated simply: the examiner found that Trans-

con's acquisition of Queen would be in the public interest, under Section 5(2) of the Interstate Commerce Act, and he recommended that it be approved.

Subsequent to the release of the hearing examiner's report, Investors on December 10, 1965 filed with the I.C.C. a complaint charging that Transcon's purchases of the depositary receipts violated Section 7 of the Clayton Act. Investors requested the I.C.C. to issue a complaint, pursuant to its authority under Section 11 of that Act. In this petition Investors claimed the following: that by its purchases of the depositary receipts through Highway, Transcon had already acquired control of Queen as part of a conspiracy to create an illegal duopoly and to violate Section 7 of the Clayton Act; that overt acts in violation of the Clayton Act, such as the purchase of the depositary receipts, also constituted violations of the Sherman Act; that Transcon, Queen, and GRIC had made misrepresentations to the I.C.C. and the Government; and that the releases executed in February 1965 were void because obtained fraudulently. Investors asked the Commission to order a divestiture of shares and depositary receipts and to request the Attorney General to investigate violations of the Sherman Act.[9]

On January 24, 1966 Investors wrote to the Commission supplementing its December 1965 petition, and urging the Commission to test the legality of Transcon's acquisition of GRIC under the Clayton Act.[10]

On May 18, 1966, Division 3 of the I.C.C. dismissed Investors' petition because a proceeding under Section 11 of the Clayton Act would "refer to facts of record and matters at issue" in the

---

7. Burt Aff., Par. 48; Interstate Investors, Inc. v. United States, supra, at 389. Section 11 of the Clayton Act empowers the I.C.C. and other administrative agencies to issue complaints whenever they believe any person is violating certain provisions of the Clayton Act, including Section 7, 15 U.S.C. § 18.

8. Report and Order Recommended by M. L. Winson, hearing examiner, Interstate Commerce Commission, November 1, 1965, pp. A77–A133.

9. Plaintiff's Ex. F to the Complaint before the three-judge court.

10. Plaintiff's Ex. G to the Complaint before the three-judge court.

acquisition or "control proceedings" then under review by the Commission.[11]

On May 26, 1966, Investors again wrote to the Commission urging it to reconsider its dismissal of the Clayton Act petition. This letter is replete with the same allegations of false representations that Investors makes now.[12]

On June 2, 1966, Investors wrote once again to the Commission, purporting to offer further proof of Clayton Act violations. In substance, it argued that the deposit receipts arrangement enabled Transcon to acquire control of Queen prior to Commission approval of the acquisition—a claim it had already submitted. This time, however, it added the contention that such consummated violations of the Clayton Act could not be legalized retroactively nor be given immunity from the antitrust laws by the I.C.C.[13]

On August 10, 1966, the Commission issued its order in the control proceeding upholding the examiner's finding that the acquisition was in the public interest and approving the transaction.[14] A synopsis of the order is set forth in this opinion below.

Rebuffed by the Commission, Investors turned to the courts for relief, commencing action under 28 U.S.C. §§ 2321–2325 against the Commission and Transcon to enjoin or set aside the I.C.C.'s orders, including its refusal to file a complaint against Transcon for alleged Clayton Act violations. In addition, Investors alleged violations of Sections 1 and 2 of the Sherman Act, 15 U.S.C. §§ 1, 2. In a unanimous decision the three-judge court approved the I.C.C. decision and upheld the acquisition, but dismissed those portions of the complaint which sought private relief for antitrust violations, with leave to file within sixty days an amended complaint stating those claims.[15] A summary of the court's observations and conclusions appears infra.

As stated above, Investors appealed the decision of the statutory three-judge court. In a one-sentence, per curiam opinion, the United States Supreme Court affirmed the judgment. Interstate Investors, Inc. v. United States et al., 393 U.S. 479, 89 S.Ct. 707, 21 L.Ed.2d 687 (1969).

Investors thereafter continued its determined effort to overturn the approved acquisition by filing with the Commission a petition to reopen the proceedings. This petition was filed on March 10, 1969, a few weeks before the present suit was commenced. While the instant motion was sub judice, the Commission on September 15, 1969, rejected Investors' petition, noting

"* * * the petition * * * should not be entertained in that the issues presented in the subject petition were previously raised by * * * [Investors] before the Commission and the courts sustaining the Commission's decision herein; * * * moreover, such evidence sought to be introduced would be cumulative, and would not affect the decisions herein * * *" (Order of the Interstate Commerce Commission, September 15, 1969.)

## II. ANALYSIS OF THE PARTIES' CLAIMS

It will be recalled that Investors accuses Transcon of conspiring to acquire Queen by purchasing Queen's shareholders' deposit receipts for cash, submitting false representations to the Internal Revenue Service, and, in general, acquiring

---

11. This I.C.C. order dismissing the petition formed the basis for most of Investors' antitrust claims in the complaint before the three-judge court. That is, Investors claimed that the order was erroneous and that the I.C.C. should have charged defendants with Clayton Act violations.

12. Plaintiff's Ex. O to the Complaint before the three-judge court.

13. Plaintiff's Ex. H to the Complaint before the three-judge court.

14. 101 M.C.C. 550.

15. Interstate Investors, Inc. v. United States, 287 F.Supp. 374 (S.D.N.Y.1968).

control of Queen prior to I.C.C. approval, all in violation of the antitrust laws.

■ Defendants maintain that Transcon's acquisition of Queen was immunized from the antitrust laws, pursuant to Section 5(11) of the Interstate Commerce Act, by the I.C.C. order which approved the transaction. Section 5(11) reads, in relevant part:

"The authority conferred by this section shall be exclusive and plenary, and any carrier or corporation participating in or resulting from any transaction approved by the Commission [under Section 5(2), which empowers the I.C.C. to authorize consolidations and mergers between two or more carriers] * * * shall have full power * * * to carry such transaction into effect * * *; *and any carriers or other corporations, and their officers and employees and any other persons, participating in a transaction approved or authorized under the provisions of this section shall be and they are relieved from the operation of the antitrust laws* and of all other restraints, limitations, and prohibitions of law, Federal, State, or municipal, *insofar as may be necessary to enable them to carry into effect the transaction so approved* * * *and to hold, maintain, and operate any properties and exercise any control* * * *acquired through such transaction.*" 49 U.S.C. § 5(11). (Emphasis added.)

Defendants contend that this provision directly and explicitly exempts them from liability under the antitrust laws, since both the Commission and the courts have approved the acquisition of Queen by Transcon. They correctly cite several cases, including McLean Trucking Co. v. United States, 321 U.S. 67, 64 S.Ct. 370, 88 L.Ed. 544 (1944), Seaboard Air Line R. Co. v. United States, 382 U.S. 154, 86 S.Ct. 277, 15 L.Ed.2d 223 (1965), and Minneapolis and St. Louis R. Co. v. United States, 361 U.S. 173, 80 S.Ct. 229, 4 L.Ed.2d 223 (1954), for the prop-

osition that acquisitions of carriers subject to I.C.C. approval shall be governed exclusively by Section 5 of the Interstate Commerce Act, and maintain that to allow defendants to be held liable under the antitrust laws after receiving Section 5 approval would be counter to the Act.

To avoid the seemingly insurmountable bar to recovery erected by Section 5(11), plaintiff offers two arguments. It contends, in the first place, that the provision operates only "in futuro"—that is, it cannot and does not retroactively immunize the participants in a Section 5 (11) transaction from liability for conduct in violation of the antitrust laws, if that conduct took place prior to I.C.C. approval of the acquisition. Investors also maintains that, while Section 5(11) may immunize participants to an acquisition from liability for monopolizing or creating restraints of trade, it does not immunize them for *conspiring to achieve* those results. I disagree with Investors' contentions, and find, for the reasons set forth below, that Section 5(11) of the Act bars recovery under this complaint based on the antitrust laws.

## III. THE EFFECT OF THE IMMUNITY STATUTE

### A. Section 5(11) May Have Retroactive Effect.

Investors maintains that Section 5(11)'s qualifying phrase "insofar as may be necessary to enable them to carry into effect the transaction * * * " and the phrase "shall be and they are relieved * * * " reflect an intention to have the section apply only in "futuro." On this theory, a conspiracy, which necessarily would have been formed prior to I.C.C. approval, would not be exempted from the operation of the antitrust laws. Investors argues further that anything not conclusively resolved by the hearing examiner—such as Investors' claims for private relief and its charges of fraudulent misrepresentations—is not exempted by Section 5(11) because, Investors

claims, the fact that such matters were not resolved shows that they were not "necessary to enable them to carry into effect the transaction." Investors cites no legislative history in support of this proposition, and none is to be found.[16] Contrary to Investors' interpretation, a review of the case law leads to the conclusion that Section 5(11) may indeed confer immunization retroactively.

At the outset, it is necessary to note that the Supreme Court explicitly refrained from providing a clear answer to this question in Minneapolis and St. Louis R. Co. v. United States, 361 U.S. 173, 191, 80 S.Ct. 229, 246, 4 L.Ed.2d 223 (1954), where the Court stated:

> "Minneapolis contends that § 5(11) operates only *in futuro* and confers 'no authority to purge the taint of a transaction illegal at the time it was brought to the Commission.' Whether there is merit in that contention, as a legal abstraction, we need not decide * * *."

The only case which Investors cites in support of its asserted proposition that Section 5(11) may not have retroactive effect is Carnation Co. v. Pacific Westbound Conference, 383 U.S. 213, 86 S.Ct. 781, 15 L.Ed.2d 709 (1966).[17] The language in *Carnation* on which plaintiff relies for the proposition that Section 5(11) operates only in the narrow "in

futuro" sense urged by plaintiff is as follows:

> "The award of treble damages for past and completed conduct which clearly violated the Shipping Act would certainly not interfere with any future action of the Commission. Although the Comission can approve prospective operations under agreements which have been implemented without approval, * * * the Commission has no power to validate pre-approval implemetation of such agreements." 383 U.S. at 222, 86 S.Ct. at 787.

*Carnation* provides little support for Investors' position. When the Court there said that the Federal Maritime Commission's power to confer antitrust immunity, under a provision in the Shipping Act that is analogous to Section 5(11), does not extend to "pre-approval implementation of such agreements," it was referring, under the facts of that case, to agreements (1) that had *not* been approved at the time the treble damage suit was brought, (2) that were "clearly unlawful," and (3) that were "past and completed." In this case, however, the acquisition *has* been approved, the Commission and the courts have both found that Transcon did *not* acquire pre-approval control over Queen, and plaintiff has *not* made—indeed, cannot make—the preliminary showing of unlawfulness that

16. It is surprising that Investors does not point to the language contained in § 5a of the Act, 49 U.S.C. § 5b(9), to support its textual interpretation of § 5(11). Section 5a, which was enacted in 1948 as part of the Reed-Bulwinkle Act, confers upon carriers relief from the operation of the antitrust laws insofar as rate-making agreements are concerned. The parties to such agreements are relieved *"with respect to the making of such agreement[s]*, and with respect to the carrying out" of them as well. (Emphasis added.) It might be argued that had Congress intended to extend such explicit retroactive immunity for acquisition agreements, it would have amended § 5(11)—which was first enacted in 1920—to contain the same language as to the "making" of agreements. However, this "arguable" contention is

not persuasive, in view of the other factors discussed infra.

17. In invoking *Carnation*, plaintiff apparently is relying on a somewhat ambiguous footnote in the opinion of the three-judge court in this case, in which that court stated (287 F.Supp. at 385, n. 25):

> "In view of our holding that the Commission's order is supported by substantial evidence * * * the acquisitions themselves are exempted from the antitrust law, 49 U.S.C. § 5(11). Thus plaintiff's anti-trust remedies, if any, are limited to the period prior to Commission approval. Carnation Co. v. Pacific Westbound Conference, 383 U.S. 213, 932, 86 S.Ct. 781, 15 L.Ed.2d 709, 851 (1966)."

in *Carnation* was apparent from the very fact that the transaction was unapproved by the Maritime Commission. Furthermore, the acquisition here is still in effect, and to subject Transcon to antitrust liability under the circumstances would undo the very purposes of the immunity clause of the Act. In *Carnation* the agreement was *terminated before* the Maritime Commission had acted on it. Accordingly, *Carnation* is not authority for the proposition asserted here by plaintiff.

More to the point as authority here are the holdings in United States v. Southern Pacific Company, 259 U.S. 214, 241, 42 S.Ct. 496, 66 L.Ed. 907 (1922), and United States v. Southern Pacific Company, 290 F. 443 (D.Utah 1923). In the first of these cases, the Supreme Court ordered that an antitrust decree be entered severing the defendant railroad's control over another railroad. Subsequently the defendant sought I.C.C. approval under Section 5 of the Act, and the I.C.C. authorized the lease by which the control had been obtained. Thereafter, however, the United States sought to have the District Court to which the case had been remanded enforce the order of the Supreme Court. But the District Court declined to do so, and instead recognized as valid the existing lease arrangement which the Commission had approved. The District Court held:

"By virtue of the Commission's * * * order of authorization said ownership of said stock under conditions imposed by the Commission is now lawful, and in respect thereof the Southern Pacific Company and the Central Pacific Railway Company are relieved from the operation of the Sherman Law (as well as of all other restraints or prohibitions of law, state or federal), in so far as may be necessary to enable them to do anything authorized or required by the said order of approval and authorization of the Commission.

\* \* \* \* \* \*

" \* \* \* The prior unlawful control with which the mandatory requirements of the decision of the Supreme Court were intended to deal has now been succeeded by a situation and relation between the two railways which is lawful \* \* \*." 290 F. at 450 supra.

The *Southern Pacific* litigation has been described as a factual precedent by which I.C.C. approval "wiped out" an antitrust decree. Carl H. Fulda, "Antitrust Considerations in Motor Carrier Mergers," 56 Mich.L.Rev. 1237, 1247 (1958).

Another commentator, Robert B. von Mehren, in "The Antitrust Laws and Regulated Industries: The Doctrine of Primary Jurisdiction," 67 Harvard Law Review 929, 959 (1954), states the following persuasive grounds for retroactive application of the immunity statute:

"[T]here remains the question whether \* \* \* [the regulatory agency] has the power to approve retroactively, thus exempting all action taken pursuant to the agreement, or only prospectively, thus exempting only action subsequent to filing, or perhaps approval \* \* \* [U]nless the language of a regulatory statute clearly indicates otherwise, the statute should be construed either to require retroactive approval whenever any approval is given or to make retroactive approval a matter of agency discretion

\* \* \* \* \* \*

"There will be few, if any, occasions that an agency should approve an agreement prospectively but not retroactively. For, if retroactive approval is denied when prospective approval is granted, an incongruous situation is created in which parties to an agreement found to be in the public interest are subject to liability for treble damages. \* \* \* "

The same concern about creating an "incongruous situation" prompted the Court of Appeals for this Circuit to observe in Butler Aviation Co. v. Civil Aeronautics Board, 389 F.2d 517, 521 (2d Cir. 1968), Friendly, J.:

"We read § 414 [of the Federal Aviation Act] and similar provisions in other statutes, such as § 5(11) of the

Interstate Commerce Act * * * as declaring that in the areas there delimited the *public interest* demands that if a transaction has survived examination by the appropriate regulatory agency, antitrust peace shall prevail * * *." [18]

(Emphasis in original.)

In view of the mandate of the Court of Appeals that Section 5(11) be read to effectuate "antitrust peace," and in view of the absence of legislative, judicial, and textual support for plaintiff's argument, I find that Section 5(11) may be applied retroactively to immunize aspects of a transaction thereafter approved by the I.C.C. This conclusion is fortified, I believe, by the parallel conclusion, to which I turn next, that it would be incongruous to allow recovery under this complaint when the conspiracy, if any, which is alleged to have been formed prior to I.C.C. authorization, was at the heart of the very transaction which was approved.

B. *Conspiracies Are Not Beyond the Scope of Exemption Conferred by Section 5(11).*

 In the present action, Investors seeks to recover treble damages for violations of Sections 1 and 2 of the Sherman Act (15 U.S.C. §§ 1, 2) and Section 7 of the Clayton Act (15 U.S.C. § 18). Section 1 of the Sherman Act declares contracts, combinations or conspiracies in restraint of trade to be illegal. Section 2 declares it to be a misdemeanor to monopolize, attempt to monopolize, or combine or conspire to monopolize any part of the trade or commerce among the states. Section 7 of the Clayton Act, which plaintiff persistently invoked throughout the I.C.C. proceedings, prohibits corporations from acquiring the stock of other corporations where the ef-

fect "may be substantially to lessen competition, or to tend to create a monopoly."

In the I.C.C. control proceedings, Investors did not allege attempted monopolization, as such, but instead accused defendants of "duopolization"—a charge necessitated by the indisputable position of dominance that Greyhound had attained, and that Transcon was attempting to challenge. The I.C.C. rejected the claim of "duopolization" and instead found that the Transcon-Queen agreement actually increased competition in the bus industry. Its finding was upheld by the courts. Cf. infra. Confronted with an inability to have the Transcon-Queen agreement declared monopolistic, in restraint of trade, or competition-reducing, Investors now claims that it was *intended* to be all these things, that it was a combination and conspiracy whose purpose was to eliminate Investors from the interstate bus industry, regardless of its effect. Investors then argues that any such combination-conspiracy is not within the immunity afforded by Section 5(11).

To support this contention, Investors first invokes some general principles applicable to the construction of immunity provisions analogous to Section 5(11). It relies primarily upon the following caveat from United States v. Borden Co., 308 U.S. 188, 198–199, 60 S.Ct. 182, 188, 84 L.Ed. 181 (1939) (construing the Agricultural Marketing Agreement Act of 1937):

"It is a cardinal principle of construction that repeals by implication are not favored. When there are two acts upon the same subject, the rule is to give effect to both if possible. * * * The intention of the legislature to repeal 'must be clear and manifest.' * * * There must be 'a positive repugnancy

18. The court then went on to cite Pan American World Airways, Inc. v. United States, 371 U.S. 296, 309, 83 S.Ct. 476, 484, 9 L.Ed.2d 325 (1963), a case discussed extensively herein. The court also distinguished the situation in Trans World Airlines, Inc. v. Hughes, 332 F.2d

602 (2d Cir. 1964), cert. dismissed as improvidently granted, 380 U.S. 248–249, 85 S.Ct. 934, 13 L.Ed.2d 817, 818 (1965), where, unlike this case, the issue was whether certain *post*-approval activities came within the immunity clause of the Civil Aeronautics Act.

between the provisions of the new law, and those of the old; and even then the old law is repealed by implication only pro tanto to the extent of the repugnancy.' "

In my view *Borden* is inapplicable here because for reasons stated below I find in the setting of the case at hand a definite and "positive repugnancy" between the provisions of the antitrust laws and those of the Interstate Commerce Act such as to uphold defendants' claim of immunization. Furthermore, the very language of Section 5(11) precludes the argument that exemption from the antitrust laws would have to be "implied" in this case. As the Supreme Court stated in McLean Trucking Co. v. United States, 321 U.S. 67, 79, 64 S.Ct. 370, 376, 88 L.Ed. 544 (1944) (the leading case as to the applicability of the very immunity statute before me):

> "It is not for this Court, or any other, to override a policy, or an exemption from one, so clearly and specifically declared by Congress * * *."

In short, United States v. Borden, supra, does not require the result which plaintiff seeks here.[19]

Beyond resting on the general principle that courts should not readily repeal or circumscribe the antitrust laws, Investors cites only one case in support of its contention that conspiracies formed for unlawful purposes are not encompassed by Section 5(11). That case, Riss & Co. v. Association of American Railroads, 170 F.Supp. 354 (D.C.D.C.1959), cert. den. Atlantic Coast Line R. Co. v. Riss & Co., 361 U.S. 804, 80 S.Ct. 108, 4 L.Ed.2d 57 (1959), relies entirely upon Atchison, Topeka and Santa Fe Ry. Co. v. Aircoach Transportation Association, Inc., 102 U.S. App.D.C. 355, 253 F.2d 877 (1958), cert. den. 361 U.S. 930, 80 S.Ct. 372, 4 L.Ed.2d 354 (1960), for the asserted proposition

that conspiracies are *not* immunizable under statutes analogous to Section 5(11) of the Act. In the *Atchison* case, the Court of Appeals for the District of Columbia held that joint rate reductions involving governmental military traffic are not necessarily excluded from the types of agreements relieved from the operation of the antitrust laws by Section 5a of the Interstate Commerce Act, 49 U.S.C. § 5b(9).[20] In dictum, the court added:

> "Even though it should be found in the end that the practices as such have been validly immunized by section 5a approved agreements, nevertheless, if they are part of an effort by Railroads in combination of conspiracy to eliminate the competition of Aircoach, rather than used merely to meet that competition, the practices would be removed from the protection of section 5a(9)."

253 F.2d at 887.

See also Slick Airways v. American Airlines, 107 F.Supp. 199, 207 (D.N.J. 1951), appeal dismissed 204 F.2d 230 (3d Cir. 1953), cert. den. 346 U.S. 806, 74 S.Ct. 54, 98 L.Ed. 336 (1953), holding that a conspiracy to drive a competitor out of business may not be relieved from the operation of the antitrust laws by the immunity clause in the Federal Aviation Act.

The passage cited from *Atchison* implies a boundary line between meeting competition and eliminating it, for the opinion indicates that only a conspiracy aimed at elimination would not be immunized. However, it is not necessary here to determine whether, even assuming arguendo that Transcon and Queen did conspire, their purpose was to "eliminate" Investors. This is so because the view that a conspiracy to accomplish predatory

---

19. Plaintiff's reliance on United States v. Philadelphia National Bank, 374 U.S. 321, 83 S.Ct. 1715, 10 L.Ed.2d 915 (1963), is similarly misplaced, for there the Supreme Court carefully contrasted the absence of an express immunity provision in the Bank Merger Act with the presence of such a provision, viz., § 5(11), in the Interstate Commerce Act. 374 U.S. at 350, 83 S.Ct. 1715.

20. Cf. note 16, supra.

ends is beyond the protection of immunity provisions like Section 5(11) has been flatly rejected by this court and others in such cases as Apgar Travel Agency v. International Air Transport Association, 107 F.Supp. 706, 711 (S.D.N.Y. 1952), Edelstein, J., and Seatrain Lines, Inc. v. Pennsylvania Railroad Co., 207 F.2d 255, 261 (3d Cir. 1953). In *Seatrain*, the court held that courts lacked jurisdiction of an antitrust action as to matters over which the I.C.C. had the power to confer approval:

"Despite the charge that the present situation is the result of a conspiracy against Seatrain the Commission sanctioned agreement may not be altered by the courts or its present limitations dealt with as an actionable wrong."

See also Report of the Attorney General's National Committee To Study the Antitrust Laws (1955), p. 280:

" * * * a mere allegation that activity within regulatory jurisdiction is pursuant to an antitrust conspiracy to injure the plaintiff should not be sufficient to oust agency jurisdiction."

Not only is there judicial authority rejecting in general plaintiff's claim as to the inapplicability of the immunization statute to a conspiracy, but there are overwhelmingly persuasive reasons for rejecting it in this particular case. Those reasons are well stated in Pan American World Airways, Inc. v. United States, 371 U.S. 296, 83 S.Ct. 476, 9 L.Ed.2d 325 (1963).[21] There, the United States charged violations of several provisions of the Sherman Act, claiming that Pan American used its half interest and control over Panagra to prevent the latter from applying to the Civil Aeronautics Board for route authorizations in territory flown by Pan American. The Supreme Court concluded that the Civil Aeronautics Board had primary jurisdiction over the matter, and held that the complaint should have dismissed. It pointed out that:

"Limitation of routes and divisions of territories and the relation of common carriers to air carriers are basic in this regulatory scheme. The acts charged in this civil suit as antitrust violations are *precise ingredients* of the Board's authority in granting, qualifying, or denying certificates to air carriers * * *." 371 U.S. at 305, 83 S.Ct. at 482. (Emphasis added.)

After specifying the criteria of choice under the Civil Aeronautics Act between antitrust considerations and the public interest in efficient transportation, the Court declared:

"It would be strange, indeed, if a division of territories or an allocation of routes which met the requirements of the 'public interest' * * * were held to be antitrust violations. It would also be odd to conclude that an affiliation between a common carrier and an air carrier that passed muster under § 408 should run afoul of the antitrust laws. Whether or not transactions of that character meet the standards of competition and monopoly provided by the Act is peculiarly a question for the Board, subject of course to judicial review * * *." 371 U.S. at 309, 83 S.Ct at 484.

Section 408 of the Civil Aeronautics Act gives the Civilian Aeronautics Board power to approve consolidations, mergers, and acquisitions. Section 414 (analogous to Section 5 of the Interstate Commerce Act) empowers the Board to relieve persons affected by its orders

"from the operations of the 'antitrust laws' * * * insofar as may be necessary to enable such person to do anything authorized, approved, or required by such order." 49 U.S.C. § 1384.

---

21. The *Pan American* decision involved the issue, or application, of the doctrine of primary jurisdiction, which is not relevant here, since the I.C.C. has already acted upon the acquisition. Nevertheless, the principles enunciated in *Pan American* are directly applicable here.

The Court concluded from this statutory scheme:

> "If the courts were to intrude independently with their construction of the antitrust laws, two regimes might collide."

371 U.S. at 310, 83 S.Ct. at 485.

The *Pan American* decision raises two questions with respect to the I.C.C.'s power in this case to confer immunity upon the participants to the Transcon-Queen acquisition for conspiring prior to Commission approval: (1) whether the "acts charged in this civil suit as antitrust violations are the precise ingredients of the [Commission's] authority" in approving the acquisition, and (2) whether a finding of liability here would in fact create a "collision" between the courts' and the Commission's construction of the antitrust laws. Both these questions must be answered affirmatively.

1. *The Acts Charged in this Suit Include the Precise Ingredients of the Transaction Approved by the Commission and the Courts.*

▮ As indicated at the outset of this opinion, the events which plaintiff maintains are "overt acts" in furtherance of the alleged conspiracy consist of the written contract between Transcon and Queen containing the deposit receipts arrangement; an allegedly secret agreement between them by which Transcon would purchase the deposit receipts from those Queen shareholders who wanted cash; the actual purchase of the receipts by Transcon, through its subsidiary, Highway; the testimony by Moore, Scheitel and Love, which plaintiff construes as a false denial of those purchases; claimed intentional misrepresentations before the Internal Revenue Service; and the allegedly unlawful acquisition by Transcon of control over Queen prior to I.C.C. approval of the proposed agreement, which, it is argued, resulted in a lessening of competition.

The following general synopsis of the decisions of the hearing examiner, the Commission and the three-judge court establishes that what are now alleged to be overt acts were in fact the "precise ingredients" of the previous proceedings, and were considered and disposed of, either implicitly or explicitly, in those proceedings.

Briefly summarized, the hearing examiner's report concluded (a) that the acquisition would not result in a monopoly, but that, even if it did, the advantages to the public would outweigh that result, (b) that the depositary receipts arrangement was subject to other related agreements, (c) that the number of shares sold for cash did not affect the control of Queen or GRIC, and (d) that the acquisition was in the public interest and should be approved.

The Commission found (a) that the deposit receipts arrangement did not enable Transcon to acquire control of GRIC and Queen, (b) that while it could not disregard the policy of the antitrust laws, it could find that the benefits to the public interest override the reduction in competition, in any given instance, and would justify the conferral of immunity from antitrust liability, and (c) that the proposed acquisition would actually increase competition.

The three-judge court held that (a) the I.C.C. correctly concluded that Transcon neither acquired unlawful control of Queen nor consummated the transaction prior to obtaining Commission approval, (b) that the Commission implicitly considered the propriety of the deposit receipts arrangement and recognized its validity, (c) that the testimony of Moore and Scheitel did not mislead the Commission and did not taint its order with fraud, (d) that the Commission's refusal to institute its own Clayton Act complaint was not incorrect, and (e) that the Commission gave proper weight to antitrust considerations and correctly concluded that the acquisitions were in the public interest.

It is true that the three-judge court dismissed those portions of plaintiff's original complaint that sought private relief, with leave to file an amended complaint stating the private claims to be

heard before a single district judge. The court took this action because

"* * * the three-judge procedure should be used sparingly in view of the heavy demands it makes upon judicial manpower * * *."

287 F.Supp. at 384.

The court went on to state that:

"* * * [i]n our view, the issues presented by the petition to review are so different from those raised by plaintiff's private action that joinder is unnecessary to an effective review of the I.C.C. order." *Id.* at 385.

The three-judge court did not indicate what "different" issues it expected plaintiff to raise in this amended complaint, but the foregoing review of the issues actually presented in the previous proceedings demonstrates conclusively that in fact the amended complaint before me has turned out to contain no difference at all between what plaintiff alleged previously and what it alleges now. Only the form of the complaint and amount of requested relief have changed.

As indicated above, in the control proceedings leading to the approval of the acquisition the Commission considered the deposit receipts arrangement and concluded that it was not a partial consummation of the written contract, a determination that "necessarily included a finding that there was no agreement, formal or informal, to purchase the receipts." 287 F.Supp. at 383. It found that the deposit receipts arrangement erected no additional barrier to competition. It found that the I.C.C. was not misled by false testimony. It found that Transcon did not acquire pre-approval

control over Queen. These are the "precise ingredients" of Investors' complaint here.

True, neither the Commission nor the courts specifically stated that defendants lacked an anticompetitive purpose when they agreed upon the acquisition, or that the defendants did not make false and misleading statements to the Internal Revenue Service.[22] But they had no need to reach these issues, which are the only remaining items alleged in the present complaint. The Supreme Court, in McLean Trucking Co. v. United States, 321 U.S. 67, 64 S.Ct. 370, 88 L.Ed. 544 (1944), which established that Section 5(11) empowers the I.C.C. to approve acquisitions which might otherwise offend the anti-trust laws, pointed out that:

"* * * the Commission has no power to enforce the Sherman Act as such. It cannot decide definitively whether the transaction contemplated constitutes a restraint of trade or an attempt to monopolize which is forbidden by that Act." 321 U.S. at 79, 64 S.Ct. at 377.

The *McLean* opinion is entitled to considerable deference in the light of Chief Justice Burger's recent extensive quotation from the opinion in United States v. Interstate Commerce Commission et al., 396 U.S. 491, 90 S.Ct. 708, 24 L.Ed.2d 700 (Feb. 2, 1970), and his statement that "* * * this Court has nowhere else dealt so definitively with this issue * * * "—the issue being the weight to be accorded by the Interstate Commerce Commission to antitrust policy in proceedings for approval of a merger.

2. *Failure to Apply Section 5(11) of the Act Here Would Create an Im-*

---

22. While there has been no determination that defendants did or did not make misrepresentations to the Internal Revenue Service, it appears that plaintiff is making *no headway in its efforts to secure* relief from the Service. In Par. 61 of Burt's Affidavit, plaintiff's president states that on February 7, 1969 he was advised by telephone that the Internal Revenue Service office in North Carolina was rescinding the tax-free ruling

letter. In Paragraphs 63–64 Burt states that he wrote to the Internal Revenue Service about this information, but has not yet received a reply. It is now almost one year later. The court believes it is entitled to conclude that if the Internal Revenue Service had advised Burt that it was in fact going to rescind the ruling, But would have informed the court.

*proper "Collision" Between the Courts and the Commission.*

While the Commission and the three-judge court here did not reach the question of defendants' motives, nevertheless, as Chief Judge Ryan stated in Baltimore & Ohio Railroad Co. v. New York, New Haven & Hartford Railroad Co., 196 F.Supp. 724, 744 (S.D.N.Y. 1961):

"* * * the Commission does have jurisdiction to make factual findings on a matter peculiarly within its province—its specialized knowledge and experience—that plaintiffs were not engaging in activities which now in a different proceeding or suit are claimed to constitute a violation of the antitrust laws. * * * Not only are such factual findings an adjudication which we would be bound to accept as a basis from which to draw legal consequences * * * but in addition they are findings which by reason of statutory grant (section 5a(9)) serve to clothe the parties and their actions under an agreement approved, with immunity from prosecution under the antitrust laws."

Judge Ryan's observations as to Section 5a of the Interstate Commerce Act apply with equal force to Section 5(11) of the same Act. To allow recovery here under the reasoning that the conspiracy, if any, is outside the scope of Section 5(11) merely because there were no earlier special findings as to defendants' motives and the information supplied to the Internal Revenue Service would not only be "repugnant" to the statutory scheme of the Commerce Act, United States v. Borden Co., supra, but would also create a "collision" with the previous decisions of the Commission and the courts in this

very case. Pan American World Airways, Inc. v. United States, supra.[23] As stated by G. E. Hale and Rosemary D. Hale, "Competition or Control III: Motor Carriers," 108 U.Pa.L.Rev. 775, 830 (1960):

"In short, the antitrust laws should not be applied when intervention has occupied the field and conflict with regulation would result."

Having found that the issues raised here are identical to those previously disposed of, and that a finding of liability would, accordingly, be inconsistent with all that has occurred heretofore in this case, the only remaining question under Section 5(11) is whether relief from antitrust liability is

"necessary to carry into effect the transaction so approved * * * and to hold, maintain, and operate any properties and exercise any control * * * acquired through such transactions."

There can be no doubt here that such relief is "necessary." Treble damage liability in the requested amount of $24 million would very possibly preclude defendants from maintaining the consolidated lines in the condition of solvency which the I.C.C. and this court anticipated when the transaction was approved. In view of the three-judge court's finding that the Commission "gave due weight to antitrust considerations," 287 F.Supp. at 389, and the Supreme Court's affirmance of that finding,

"A contrary view would, in effect, * * * 'render meaningless the exemption relieving the participants in a properly approved [acquisition] of the requirements of those laws * * *.'" Minneapolis & St. Louis R. Co. v. United States, 361 U.S. 173, 191,

23. Plaintiff claims that *Marnell v. United Parcel Service of America, Inc.,* 260 F. Supp. 391 (N.D.Calif.1966), establishes that no "repugnancy" would result here if defendants were held liable under the antitrust laws. However, *Marnell* involved the question of primary jurisdiction; the I.C.C. there had not yet appraised the rates and practices in question. Here, the I.C.C. already has ruled on the acquisition that is the heart of plaintiff's complaint. It was entitled to do so under § 5 of the Interstate Commerce Act. And by so doing, it enabled defendants to do what the defendants in *Marnell* could not, viz., invoke the specific, express exemptive provision of § 5(11).

80 S.Ct. 229, 240, 4 L.Ed.2d 223 (1959).

The foregoing analysis demonstrates that Section 5(11) confers antitrust immunity on the defendants, notwithstanding plaintiff's contentions as to the inapplicability of that provision when conspiracies or conduct that preceded I.C.C. approval are involved. Although summary judgment for defendants is appropriate on that basis alone, it is noteworthy that a similar disposition might also be required as a result of the related fact that previous tribunals have disposed of the very claims that Investors makes here. As Judge Ryan stated in *Baltimore & Ohio R. Co.*, supra, 196 F.Supp. at 745:

"There is no reason why the Commission's decision should not have the status of a judgment so as to come within the doctrine of collateral estoppel by judgment. 'There was a contested proceeding before the Commission, with decision depending upon the present issue and the present parties taking opposite sides on it. Res judicata should and does apply.' Seatrain Lines v. Pennsylvania R. Co., supra, 207 F.2d at page 259; Sunshine Anthracite Coal Co. v. Adkins, 310 U.S. 381, 60 S.Ct. 907, 84 L.Ed. 1263; 2 Davis, Adm.Law, Sec. 18.02. Certainly, this is in furtherance of the doctrine 'established as a procedure for carrying out the public policy of avoiding repetitious litigation.' Partmar Corp. v. Paramount Pic., 347 U.S. 89, 91, 74 S.Ct. 414, 416, 98 L.Ed. 532."

In view of my holding that Section 5(11) of the Act bars recovery in the suit at hand, it becomes unnecessary to treat the numerous other contentions put forth by the defendants as grounds for summary judgment or dismissal. The defendants' motion for summary judgment is granted, there being no genuine issue of material fact as to the applicability here of the provisions of 49 U.S.C. § 5 (11).

It is so ordered.